**UNITED STATES v. JOHNSON et al.**
**No. 11400.**

District Court, M. D. Pennsylvania.
March 24, 1947.

M. H. Goldschein, of Washington, D. C. and Valentine Hammack, of San Francisco, Cal., for plaintiff.

Charles J. Margiotti, of Pittsburgh, Pa., and Raymond P. Campbell, of Scranton, Pa.,

for Albert W. Johnson, Donald M. Johnson, Miller A. Johnson, and Albert W. Johnson, Jr.

Stanley F. Coar and John Memolo (pro se), both of Scranton, Pa., for John Memolo.

Thomas D. Caldwell, of Harrisburg, Pa., for Jacob Greenes.

JAMES ALGER FEE, District Judge.

This trial, before a jury, resulted in the conviction of Donald M. Johnson, Miller A. Johnson, sons of former federal Judge Albert W. Johnson of this district, Jacob Greenes and John Memolo, and the acquittal of Albert W. Johnson, Jr. and ex-Judge Johnson.

At the close of the evidence for the Government, motions for acquittal were made by all defendants. These motions were reserved and denied just before the court instructed the jury. At the close of all the evidence, the defense having introduced testimony, all defendants made motions for acquittal which have been reserved. Finally, after a verdict of conviction, motions for acquittal were made on behalf of the four convicted defendants. The court denied all these motions and will discuss in this opinion the matters which were urged upon the previous arguments.

As regards the statute of limitations, the court found at the close of the Government's case, that there was evidence from which it might be inferred there was a continuing conspiracy of which all defendants were participants and that some of the acts alleged as overt acts in the indictment had been proved to have occurred. Thus a prima facie case was made out. The bar of the statute is a matter of defense. It cannot be raised by demurrer or motion for judgment of acquittal at the close of the evidence offered by the Government.[1] The court reserved the motions upon the theory that in developing the defense that the conspiracy ended in 1939 with the payment of the Williamsport fees, the court might find implications which would explain some of the evidence of the prosecution and thus permit the court to sustain the motions for acquittal as of the end of the Government's case. Since no such implications were developed by the defendants in attempting to make out the defense of the statute of limitations, the court denied the reserved motions, at the close of all the evidence.

When all the evidence is taken into consideration there are several matters which indicate the continuance of the conspiracy past September 11, 1942. The first of these are matters relating to concealment. The second are definite acts. The third are admissions of the defendants Greenes and Memolo respectively.

It is definitely charged in the indictment that one of the subsidiary objects of the conspiracy was the concealment of the acts and designs of the conspirators. Michael, who was charged as a co-conspirator, testified that he committed perjury before the Grand Jury by denying knowledge of conversations with Donald Johnson and of actions of Donald Johnson in reference to the transfer of the assets of Central Forging Company. He now tells an entirely different story regarding these incidents. He testified that he took this course in order to protect himself and Donald Johnson from the consequences of disclosure. He adhered to this course of conduct until he himself had been indicted in the other conspiracy case.

He testified that his action in concealing the facts from the Grand Jury was taken after two conferences with Donald Johnson. Donald Johnson testified also as to these two meetings. The stories are diametrically opposed as to what happened. However, the jury might well conclude that at the meeting of Michael, Miller Johnson

---

[1] United States v. Cook, 17 Wall. 168, 84 U.S. 168, 179, 21 L.Ed. 538; Hughes v. United States, 6 Cir., 114 F.2d 285, 288; Capone v. Aderhold, 5 Cir., 65 F.2d 130, 131; Greene v. United States, 5 Cir., 154 F. 401; Evans v. United States, 4 Cir., 11 F.2d 37, 39; United States v. Andem, D.C., 158 F. 996, 999.

Cf. United States v. Fiswick, 3 Cir., 153 F.2d 176, 181, reversed on other grounds, 1946, 329 U.S. 211, 67 S.Ct. 224; United States v. J. Greenbaum & Sons, Inc., 2 Cir., 123 F.2d 770, 773; Braverman v. United States, 6 Cir., 125 F.2d 283, 287; United States v. Kissell, 218 U.S. 601, 609, 31 S.Ct. 124, 54 L.Ed. 1168.

and Donald Johnson at Michael's house when he had not yet been investigated but after Miller Johnson and Donald Johnson had been called before the Grand Jury, and at the conversation between Donald Johnson and Michael at the latter's place of business at Clarks Summit, that Michael had agreed to conceal the actions of the various parties from the Grand Jury and that Miller Johnson and Donald Johnson themselves had concealed from the Grand Jury the designs and actions of the defendants. At the time this testimony was first admitted, it was limited to the particular defendants involved, but when Donald Johnson testified, the evidence became available against all defendants. The conclusions which the jury might have drawn from this evidence are sufficient to show the conspiracy continued until at least the indictment of Michael.

A similar incident relates to the check which Abe Greenes sent to Donald Johnson. The Government proved that Jacob Greenes, the defendant, gave his brother Abe Greenes a sum of money in cash and asked Abe Greenes to send a check to Donald Johnson for $350. Abe Greenes testified in the Government's case that he sent the check; that he did not know what the money was for; that he owed no money to Donald Johnson; and that he was subsequently told by Jacob Greenes that it had been agreed that the money was to be explained as an attorney fee to Donald Johnson for obtaining the concession of a cigar stand in the Jermyn Hotel. Neither the date of the check nor the date of the agreement for concealment was established in the prosecution's case. It might, therefore, have been explained that the date of these transactions was before September 11, 1942, and this, of course, would have had an effect upon the granting of the reserved motions.

However, the defense proved positively by a teller in the bank, and Donald Johnson's own records, that the date of the check was October 6, 1942; thus showing an ac-

tion in relation to money transactions between Jacob Greenes and Donald Johnson as of this date. The evidence introduced by the defense also tends to show that Donald Johnson attempted to conceal this transaction in his books. Furthermore, he admitted on cross-examination that he met with Jacob Greenes at Salsburg's office and discussed this check. At that time he told Jacob Greenes that there was nothing to explain; that the check was for legal services and that was all there was to it. This is the message which Jacob Greenes then transmitted to Abe Greenes and concerning which Abe Greenes testified in the Government's case. From this evidence, the jury might well conclude that Jacob Greenes and Donald Johnson were acting together after September 11, 1942, and that there was a deliberate effort to conceal the transaction sometime in 1944 by giving a false explanation.[2] Thus the testimony of the defense, instead of establishing that the acts were barred by the statute, gave proof positive that they had happened within three years before September 11, 1945, and the only question was whether or not these acts had relation to the conspiracy charged in the indictment.

The defense, likewise, proved as a fact that Michael filed his first and final account in the Central Forging Company case July 9, 1943. This is one of the overt acts charged in the indictment being overt act numbered 33. The defense proved that this was important in the consideration of the various testimony relating to the Central Forging case and particularly the testimony of Michael. From the document and the other testimony, however, the jury, if they believed Michael's testimony in the Government's case, could have drawn the implication that this was part and parcel of the conspiracy so charged. Thus, again, the defense did not establish that the conspiracy had ended with the conclusion of the Williamsport case in 1939, but proved an act which was charged in the indictment as tending to show its continuance and existence in 1943.

[2] In the argument upon the motions for judgment of acquittal made at the close of all the evidence, counsel for defendants virtually conceded that these various acts of alleged concealment were sufficient to carry the question of the statute of limitations to the jury as a question of fact.

■ Finally, the United States, after the close of the evidence of the defense, moved to reopen the Government's case in order to prove one of the documents the filing of which was charged as an overt act. This was overt act numbered 29 in the indictment in which it is alleged: "On or about November 11, 1943, Judge Albert W. Johnson entered an order allocating and making a redetermination of distribution of funds in the Pennsylvania Central Brewing Company case by which order John Memolo was authorized to receive $1580.07 which he did receive." The court at this time ruled that it would be improper to permit the Government to introduce the document in its case in chief but ruled that it was proper rebuttal to remove any implication which might have been established by the defense that the statute of limitations had run against the charge of the indictment. This ruling was, unquestionably, sound. The incidents of the Pennsylvania Central Brewing Company run through the entire period of the indictment since the first overt act charged and proved in that case is number 25 which reads as follows: "On or about December 22, 1934, Judge Albert W. Johnson appointed John Memolo co-trustee of the Pennsylvania Central Brewing Company case." There are numerous other acts which are charged and proved which might be proof of this conspiracy in relation to the Pennsylvania Central Brewing Company matter.

Subsequently, the court struck this document from the evidence and it was never read to or considered by the jury. The court took this action because of the fact that the defense had rested and five of the defendants had failed to testify. The court believed as a practical matter that it might be highly prejudicial to permit the document to be introduced at this stage even though the court was of opinion that it was entirely competent in rebuttal.

Upon this basis, the court overruled the motions for acquittal at the close of all the evidence as far as the statute of limitations was concerned. The court instructed the jury positively that they must find that one of the overt acts charged in the indictment had been committed within three years prior to the finding of the indictment and that such an act must be one done by a person whom they found was a participant in the conspiracy and was done to effect the objects of the conspiracy and was reasonably effective for that purpose. It is true that the court did say that some of the overt acts charged in the indictment had been proven. On objection, the court explained this instruction in accordance with the context of the body of the charge that even though they found an act so charged had been committed, they must, before they could find a conspiracy had come to fruition, find that such an act was done to further the criminal design by one of the conspirators and was reasonably effective to that end.

■ The court carefully instructed out the Koppelman and Kizis incidents as overt acts against the balance of the alleged conspirators, but as far as Memolo is concerned, his knowledge as shown by his admissions of both the Koppelman and Kizis cases, might indicate that as far as he was concerned, they were part of the continuing conspiracy. This same situation is true as to the defendant Greenes on his own admissions. Neither Greenes nor Memolo were involved in the Central Forging Company case but if a continuing conspiracy were proved[3] which involved them and an overt act were done by Donald Johnson or Michael in the Central Forging case, Greenes and Memolo would be bound as members of the conspiracy although they had no direct part in the particular transaction.[4]

The next question relates only to Donald Johnson. Donald Johnson was a defend-

[3] The jury so found after being emphatically and repeatedly instructed that they must acquit no matter how many separate conspiracies or substantive offenses they found unless they also found a general, continuing conspiracy to corrupt justice in the manner and form charged in the indictment.

[4] Among the many authorities, reference may be made to United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 and United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 60 S.Ct. 811, 84 L.Ed. 1129.

ant in a conspiracy case which involved some of the same incidents as those which have been related in evidence by Michael in this case, and also by the defense witness Davis. The indictment in this cause was against Donald Johnson, Michael, Davis, Knight and Fenner. Michael was the trustee in bankruptcy of the Central Forging Company. This indictment was offered and received in evidence as was also the verdict showing that Michael, among others, was convicted, and Davis and Donald Johnson were acquitted. The court admitted this evidence in accordance with the rule of United States v. DeAngelo, 3 Cir., 138 F.2d 466. However, the court rejected the offer of the transcript of evidence given in the former trial and portions of it when it was tendered by the defense. It seems so far as the DeAngelo case is concerned, this court carried out specifically the direction of that opinion. However, the court instructed the jury that the conspiracy charged in the indictment so received in evidence, was an entirely different crime than the charge of conspiracy made in the instant indictment. The alleged conspirators in the former case were charged with a conspiracy to violate Section 52, sub.a, U.S. C.A. Title 11. The substantive offense could have only been committed by a trustee in bankruptcy. Apparently, those convicted in the criminal case were the trustee and his attorneys and others connected with the bankruptcy administration. The substantive offense which was charged as the object of the conspiracy related only to appropriating or transferring the property "which came into his charge as trustee." It is perfectly apparent in this connection that Donald Johnson may have received the money as charged in the former indictment as an overt act, but the jury might have found that he had no idea that the money came from the trustee or was part of the assets of the bankrupt estate. He may well have thought that it was part of the legitimate fees allowed to the attorneys which was paid to him on account of his supposed influence. Further, the jury may

have concluded that although he received the money he was not part of a conspiracy to receive the assets of a bankrupt estate, but on account of his position had taken toll from attorneys who were practicing in his father's court. Obviously, even if acquitted of that conspiracy which was entirely ruled out by the court on this ground, namely that it was not the conspiracy charged in this indictment, Donald Johnson could still be guilty of the charge of this indictment and the same facts might well have led to the conclusion that he was innocent in that case but guilty in this one where an entirely different conspiracy was charged.

However, the court did not stand upon this ground. The court instructed the jury in the most positive terms to entirely disregard any of the acts which were charged as overt acts in the former indictment and particularly the taking of the $2500, in considering the connection of Donald Johnson with this conspiracy. This was going very much further than defendant Donald Johnson was entitled to have the court go under any rule whatsoever, but as the court told the jury, the court was impelled to take this action in order to prevent anyone from being tried twice on the same fact.

Actually, the court could have ruled the matter out altogether as impertinent.[5] The DeAngelo case shows that the former acquittal was not a bar to the prosecution of the conspiracy indictment. Similarly, no question of double jeopardy was involved. The first trial for one conspiracy and the second trial for another conspiracy did relate to the same incidents in part, but the charges of the indictment were for separate and distinct offenses none the less.

 Notwithstanding the dictum in the DeAngelo case, the verdict in the former case established nothing. The doctrine which is applicable here and the only doctrine, is that of estoppel by judgment. The case of United States v. Adams, 281 U.S. 202, 205, 50 S.Ct. 269, 74 L.Ed. 807, which was cited in the DeAngelo case, makes this clear. It is there said:

---

[5] Manning v. United States, 8 Cir., 275 F. 29, "If the offenses are distinct in law, the plea is bad regardless of how closely they are connected in point of fact." Piquett v. United States, 7 Cir., 81 F.2d 75, 79; Short v. United States, 4 Cir., 91 F.2d 614, 624, 112 A.L.R. 969. See note 147 A.L.R. 991.

"But although not technically a former acquittal, the judgment was conclusive upon all that it decided."

In relation to this the court say in the DeAngelo case [138 F.2d 468]:

"Nor can there be any requirement of mutuality with respect to a criminal judgment's conclusiveness."

Notwithstanding, the court subsequently refers to the verdict in the former case as though it were the judgment. It is submitted that this is not the rule. A verdict without a judgment does not raise an estoppel or operate as res judicata or autrefois acquit.[6] The trial court carefully called the attention of Mr. Margiotti, counsel for the defense, to this technical requirement in plenty of time to have cured the matter by the introduction of a judgment. He was of counsel in the former trial also. However, Mr. Margiotti chose to stand on the record as it was. In the exposition of estoppel in criminal cases set out in United States v. Oppenheimer, 242 U.S. 85, 87, 37 S.Ct. 68, 69, 61 L.Ed. 161, 3 L.R.A. 516, the point is made abundantly plain.

"It cannot be that a *judgment* of acquittal on the ground of the statute of limitations is less a protection against a second trial than a *judgment* upon the ground of innocence, or that such a *judgment* is any more effective when entered after a verdict than if entered by the government's consent before a jury is empaneled; * * *." (Emphasis supplied.)

In any event, as a practical matter, the court gave the defendant complete protection against re-trial of the facts underlying the former judgment, if there was any. As noted above, the court extended the rule far beyond anything to which this defendant was entitled.

■■■ The point is raised as to the defendants Greenes and Memolo that the Grand Jury testimony given by them respectively was recited by the official reporter to the jury in this case. It is contended that there was no authority for the use of such testimony in the case of the prosecution in chief but that the United States would be confined to the use of such testimony for impeachment of the particular defendant as a witness. The court, by positive instructions, prevented the use of this testimony as against any of the other defendants and therefore, none are involved in consideration of this question except the defendants who gave the testimony themselves. The Government is always entitled to prove what the defendant said about the acts charged in the indictment. The expressions of a defendant may be denials of guilt. They may contain hearsay. They are admitted for the purpose of showing his state of mind with reference to the acts done. The Government has never been denied the right to use a confession of a defendant in chief provided it was voluntarily made. Proof of ordinary admissions can be made without preliminary foundation as to voluntariness even when produced in chief. The evidence of the admissions before the Grand Jury of one of these defendants should not be excluded simply because these were made before an official body. Even though the testimony is construed as a confession it should not be excluded from the Government's case in chief. The rule as to admissions and confessions made elsewhere certainly should control here. The testimony was adduced before the Grand Jury in response to lawful process, namely, a subpoena, and the record shows that the defendant was specifically warned of his right against self-incrimination. The secrecy of the Grand Jury investigation should be no bar. All the precautions which are often lacking in extra-judicial admissions or confessions were here taken. Therefore, the Government had a right to bring out the relation of the testimony of each of these defendants as against him alone on the ground that it contained admissions against interest. The court carefully instructed the jury that proof of a conspiracy and the doing of an overt act must be found before the admissions of a defendant could be used to determine whether that defendant was a participant in the conspiracy.

■■■ The motions are denied.

---

[6] Reed v. Merrimac River Locks, 8 How. 274, 12 L.Ed. 1077; Smith v. McCool, 16 Wall. 560, 21 L.Ed. 324; State v. Kraus, 175 Minn. 174, 220 N.W. 547; Dunsmore v. Franklin Fire Ins. Co. of Philadelphia, 299 Pa. 86, 149 A. 163.