### UNITED STATES of America

v.

Francis **LABATE**, Joseph P. **Ballard**, Francis Jack **Kesting**, Harry **Deering**, Harry H. **Nonnemacker**, Jr., Aaron **Sussman**, Harry **Nassau**, Maurice Herbert **Chamberland**, Harry **Chorney**, Charles F. **Spalazzo**.

**Crim. No. 19412.**

United States District Court
E. D. Pennsylvania.
Nov. 14, 1958.

Harold K. Wood, Henry P. Sullivan, Philadelphia, Pa., for plaintiff.

Daniel H. Greenberg, New York City, for Aaron Sussman and Harry Nassau.

LORD, District Judge.

The present post-conviction motions of defendants, Aaron Sussman and Harry Nassau, are before the Court following a jury verdict finding each respectively guilty of thirteen and eight substantive counts of receiving stolen government property in violation of 18 U.S.C.A. § 641, and of conspiring to commit those offenses in violation of 18 U.S.C.A. § 371. A third defendant, Charles F. Spalazzo, tried at the same time and found guilty of conspiracy and on fifteen substantive counts has not appealed.

The principal assignment of error is that whereas the indictment alleged a single continuous conspiracy from January 6, 1950 until March 15, 1956, the evidence as a matter of law indicates that there were in fact multiple conspiracies. In short, the defendants allege that there was a hiatus in the activities of the conspiracy in 1952 which terminated the confederacy which had commenced in 1950. It is asserted that the thefts which began anew in early 1954 are part and parcel of a new conspiracy. Defendants ask this Court to recognize the variance, if any, as fatal.

Defendants likewise contend that the evidence, as a matter of law, did not establish the guilty knowledge as to the stolen character of the cloth on the part of the defendants requisite to sustain the verdict.

Neither assignment of error is meritorious.

## I.

Although the mid 1952–early 1954 period is important on the issue of termination, a proper understanding of its relationship to the entire conspiracy requires a summary of the facts as the jury may have found them from the evidence.

In its tangible beginnings in 1950, the conspiracy consisted basically of two units or divisions, which may be termed for convenience the *employees* and the *retailers*, respectively. The first group had five members, all employees of the Philadelphia Quartermaster Depot. When cloth for which there was commercial demand was available, it was their job to notify the retailers, and to make the arrangements for a time when the taking would be least hazardous. This unit was also responsible for the physical loading of the rented trucks in which the retailers arrived at the Depot, for the destruction of gate passes used by the retailers in entering and leaving the Depot, and for final concealment of evidence of the thefts by destruction or alteration of the Depot records.

Throughout the life-span of the conspiracy, 1950–1956, five of the employees remained in the conspiracy. The only change in the personnel or functioning of this group was the addition of one member, Joseph P. Ballard, who joined their membership in 1954. This group's assistance made possible some 15 to 20 thefts during the initial two years of the conspiracy and some 17 more during 1954–1956. The resulting loss to the Government amounted to many thousands of dollars.

It is to be noted that of the entire six of these employees named in the indictment, five entered a plea of guilty to every count in which they were named, and appeared as Government witnesses at this trial. The only one who went to trial was Spalazzo. The conspiracy count to which those pleas of guilty were made specified thefts occurring in May, July, and October of 1953, which is a period

asserted by the present defendants to have been devoid of activity.

During the 1950–52 phase, the principal members of the retail group, for purposes of this opinion, consisted of Martin Weiner, David Stolper, and the latter's mother, Mrs. Stolper. One Robert Lichtman, owner of a woolen manufacturing company in Philadelphia, entered the organization sometime in 1951 and became one of the chief salesmen for the combine. This group served dual functions. Not only did they serve their primary task of procuring legitimate outlets for the stolen cloth, but Martin Weiner and David Stolper also served the transportation needs of the organization by actually entering the Depot in rented trucks to pick up and remove the cloth with the aid of their fellows, the employees.

Until 1952 the stolen cloth was sold to various legitimate customers in New York, Chicago, and elsewhere. All cloth was invoiced and sold under the name of "Myron Wexlar", a fictitious name devised by Mrs. Stolper. Payments were received by check and deposited in a bank account opened in the Wexlar name. While Mrs. Stolper handled all financial transactions, Weiner, David Stolper and Lichtman each received a share of the proceeds.

Operations continued smoothly until Mrs. Stolper's death in 1952 and a subsequent F.B.I. investigation into the Myron Wexlar account. According to Martin Weiner, this latter investigation came about as a result of a sale of stolen cloth to the American Braid Co. of New York City. The American Braid Co. had apparently become involved in financial difficulties and the F.B.I., for reasons not disclosed by the record, began to look into their accounts, among which was "Myron Wexlar." Since the checks carried the address of Martin Weiner's Army and Navy Store in Philadelphia, it was but a short time before Weiner was interviewed by federal agents. According to Weiner the actual cessation of thefts resulted from this inquiry by the F.B.I., and it is this temporary suspension in the operations of the conspiracy which the defendants maintain terminated the original unlawful venture. It is to be noted that no arrests were made at this time.

Thereafter, late in 1953, Lichtman made connection with a new outlet, defendant Sussman, for the disposition of the cloth. The Quartermaster employees were again contacted with a view to a resumption of operations by Weiner. Operations did in fact resume in February of 1954 and seventeen truckloads of cloth were stolen from the Depot at various times between February 17, 1954 and March 14, 1956. Except for some unimportant changes, the modus operandi of the actual thefts of the cloth followed the original established pattern, although Martin Weiner's brother, William, now joined him in renting the trucks and removing the cloth from the Depot, Stolper having no further connection with Weiner after 1952.

The method of disposal of the cloth, however, was quite different during the 1954–56 period. Of the seventeen loads of cloth stolen, thirteen were sold to defendant, Aaron Sussman, the other four being sold directly to legitimate dealers. Nassau joined Sussman as a partner in approximately July, 1954, and participated in the purchase of the last eight truckloads. The sales to Sussman and Nassau were for cash and without invoice, in contrast to the sales to the legitimate outlets in which invoices were delivered and payment received primarily by check.

Upon notification from the Quartermaster employees that a shipment was available for theft, Weiner or Lichtman would notify Sussman and Nassau in New York and the latter two would come to Philadelphia on the day the goods were stolen or the day following. They would meet Weiner and/or Lichtman at the "spongers"—the commercial finishers to whom the stolen cloth was customarily taken for measuring, shrinking, and removal of all identifying tags and marks. After inspecting the cloth, Sussman and

Nassau would pay approximately $1 per yard in cash which would be used immediately to pay off the Quartermaster employees—an act usually performed by Weiner. The balance of the cost of the goods would usually be paid over to Lichtman or Weiner a few days later, again in cash. Since they received no invoices from Weiner or Lichtman, Susman and Nassau used invoices printed up by them especially for the purpose in the fictitious name of "Samuel Miller," in order to complete their records. After each purchase the cloth was subsequently resold by Sussman and Nassau to legitimate dealers.

Eventually on March 14, 1956 another Quartermaster employee observed a theft in progress and reported that fact to his superiors. An investigation by the F. B.I. followed and shortly thereafter this prosecution was instituted.

## II.

A conspiracy usually terminates by one or more of the following means: (1) *naturally*, by full consummation of the unlawful design; (2) *voluntarily*, by affirmative acts of withdrawal or by abandonment; or (3) *involuntarily*, as a result of some outside force such as arrest or death.

It might be argued that the instant case encompasses, to some degree, each of the three methods. Although the defendants allege generally that a period of temporary inactivity in 1952 terminated the conspiracy, a closer examination of the record indicates that in terms of actual events the position of the defendants could conceivably be that: (a) the actual cessation of thefts in 1952 was a natural termination or voluntary abandonment of the conspiracy; (b) David Stolper's voluntary withdrawal in 1952 terminated the conspiracy; or (c) the death of Mrs. Stolper amounted to an *involuntary termination* of the conspiracy. These possibilities will be discussed in order.

Unlike terminations effectuated by voluntary or involuntary factors, the natural termination of a conspiracy depends upon a finding that the conspiracy has spent itself within the "scope of the conspiratorial agreement." See Grunewald v. United States, 1957, 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931; Cleaver v. United States, 10 Cir., 1956, 238 F.2d 766. As to such scope, the evidence here points to an inference that the agreement was to steal not one truckload, nor for that matter, any specific number of loads of cloth. The agreement may be measured by the subsequent acts of the members. Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. In this light, the overriding purpose of the conspiracy appears to have been the stealing of cloth from the Philadelphia Quartermaster Depot whenever the proper conditions presented themselves, without regard to any time period.

The testimony in fact tended to show that thefts were made when the conditions were propitious—that is, whenever there was available a particular type of cloth for which there was commercial demand, when there was little likelihood of detection, and especially when there was available a means for safe disposal of the cloth. The last-mentioned element, a safe outlet, was vital if the ultimate purpose of the combination—dollar profit—was to be realized.

It is thus significant that a cessation of thefts commenced in 1952 immediately after the death of Mrs. Stolper. The latter was a chief cog in the disposal machinery. Her death not only jeopardized the functioning of that unit but incidentally deprived the combination of its source of working capital, since Mrs. Stolper had always been the one who supplied the ready cash for the cash payoff of the employees at the Depot. Since the testimony showed that such employees were in fact compensated almost immediately after every theft, both in the 1950–1952 as well as in the 1954–1956 phases, it is a fair inference that they were not willing to extend credit, so to speak. Thus the cutting off of the cash

supply seems in itself to have been a very probable reason for the suspension of operations which followed her death.

It has been argued that the cessation was the result of fright generated within the conspiracy as a result of the F.B.I. investigation of the fictitious "Myron Wexlar" account. That investigation came at about the same time as Mrs. Stolper's death but, as explained, was in no way connected with it.

■ On the whole, however, there is no substantial evidence to indicate that the fear of discovery motivated the 1950–1952 membership to withdraw voluntarily or abandon the conspiratorial relationship among themselves. See Eldredge v. United States, 10 Cir., 1932, 62 F.2d 449; Commonwealth v. Doris, 1926, 287 Pa. 547, 135 A. 313. For one thing, there is the presumption that a conspiracy continues until the contrary is shown. Hyde v. United States, 1912, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114; Miller v. United States, 4 Cir., 1921, 277 F. 721; Marino v. United States, 9 Cir., 1937, 91 F.2d 691, 113 A.L.R. 975. In that connection the record of testimony negatives any contention that no activity in furtherance of the conspiracy took place during that period.

There was testimony that not until the latter part of 1952 did Lichtman learn, from Martin Weiner, that the cloth had been stolen and of how it had been procured. On the other hand, Weiner himself testified that Lichtman had been aware of the unlawful enterprise long before this time. Be that as it may, there is at least a reasonable inference that Martin Weiner and Lichtman thereafter maintained contact with one another, looking forward to finding a new outlet with the needed capital. And it is a fact that in late 1953 or early 1954 they located defendant Sussman, who seemed to meet their requirements.

■ In sum, the acts of Weiner and Lichtman are consistent with an inference that the conspiracy had not come to an end, and that its members were determined to continue on as best they could in spite of interrupting circumstances. See Fiswick v. United States, 1946, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196; United States v. Rollnick, 2 Cir., 1937, 91 F.2d 911. It should be added that, under familiar principles, the activities of these two men were binding upon all members of the conspiracy.

■ Another contention is that a termination of the entire conspiracy resulted from the voluntary withdrawal of David Stolper in 1952. In at least two respects that position is untenable. In the first place, it is settled that a voluntary withdrawal of one member of a conspiracy does not terminate the unlawful combine as to other members who do not withdraw. At most it is a personal severance which affects and limits the responsibility of the withdrawing member alone. Marino v. United States, 9 Cir., 1937, 91 F.2d 691. More significant, however, is the fact that Stolper's withdrawal occasioned a distribution of the assets presently on hand as between Stolper and Martin Weiner. The "Myron Wexlar" bank account was closed and the proceeds divided, in uncertain proportions. Weiner apparently received a right to a money claim in the sum of some $14,000 at that time owing from the American Braid Co. of New York City, for a shipment of stolen cloth. This claim was subsequently settled for a minimal amount after continued efforts to negotiate a compromise by Lichtman and Weiner, the proceeds eventually going to Weiner. This act is clearly within the scope of the original agreement—converting the stolen cloth into spendable dollars. See McDonald v. United States, 8 Cir., 1937, 89 F.2d 128.

As indicated above, the death of Mrs. Stolper was sorely felt at all levels of the conspiracy. The conspiracy vitally needed someone with an outlet for the cloth to legitimate dealers and at the same time required a member with sufficient capital to make immediate payments to the employees at the Depot. Although the death of Mrs. Stolper might have been sufficient reason for terminating the conspiracy if there had been no further

activities by any of the co-conspirators, the subsequent activities of both Lichtman and Weiner to further the organization in the manner originally contemplated negates the assertion that the conspiracy terminated with her death.

About the only limiting dimension of the conspiracy, in terms of the evidence, was the situs of the thefts. The stage set for the acts of thievery was never changed—it was always the Depot of the Philadelphia Quartermaster. The play there enacted consisted of two acts, however, and several of the actors who appeared in the first were not onstage in the finale. Furthermore, at least two actors appeared for the first time in the final scenes, Sussman and Nassau. The circumstance that there was an intermission between the acts, with considerable backstage activity in that interim, and that there were minor changes in the cast, was by no means fatal to the continuity of the conspiracy drama, in the view which the jury must necessarily have taken.

Indeed, it was solely for the jury to determine whether or not the activities of Lichtman and Weiner during the so-called intermission and in the final scenes of 1954–1956 were done " * * * in furtherance of the common design, or whether it was a natural and probable consequence flowing from the execution of the common design. * * *" 1 Wharton, Criminal Law § 90, p. 197 (Anderson ed. 1957) and cases cited. The Court charged that in order to convict the defendants of conspiracy the jury must find that a conspiracy existed "as charged in the conspiracy count of the indictment" and that since "a single conspiracy is charged," defendants, to be guilty, must be shown to have been parties to one common conspiracy. There being evidence in the record from which this determination could have been made, the Court is bound by the jury's finding of one conspiracy as demonstrated by their verdict. Papalia v. United States, 5 Cir., 1957, 243 F.2d 437; Jolley v. United States, 5 Cir., 1956,

232 F.2d 83; Coates v. United States, 9 Cir., 1932, 59 F.2d 173.

### III.

Defendants' reliance on the recent case of United States v. Russano, 2 Cir., 1958, 257 F.2d 712, as authority for the granting of a new trial, is misplaced.

In that case, the indictment charged the two appellants with membership in a single continuous conspiracy to traffic in narcotics from 1951 to 1957. The Court of Appeals for the Second Circuit reversed their convictions and granted a new trial. The Court held that the evidence, if it established *any* conspiracy at all, tended to place the defendants in two separate ventures in 1952 and again in 1955–56. So weak was the evidence that the Court, for the sake of discussion of variance, assumed "without deciding" that appellants had been members of the conspiracies. Also, in sharp contrast to the instant case, the Court found that the conspiracy of 1952, if it existed at all, had been terminated by the *arrest* of two principal members. Likewise, there was no evidence at all as to activities *of any member* of the 1952 membership during 1953–54. The Court noted (257 F.2d at page 715):

> "If there were *any* evidence concerning the years 1953 and 1954, it might be possible to sustain the appellants' convictions on the theory that a single conspiracy existed throughout the six and one-half year period specified in the indictment, even though with a fluctuating membership. * * *" (Emphasis supplied.)

The prejudicial effects of a variance, if any, must be judged on the individual facts of each case. Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Russano, supra.

Having considered the entire record of the present case, this Court is satisfied that *none* of the elements deemed fatal

in Russano are present, and that the latter decision in no way controls the instant case.

### IV.

The Court also rejects defendants' argument that the evidence failed to establish their guilty knowledge of the stolen character of the cloth. The evidence on this point was overwhelmingly against the defendants.

Initially, defendant Sussman admitted that he and Nassau purchased the stolen cloth in the amounts and at the approximate times alleged in the indictment. In early February of 1954, a meeting was held at Martin Weiner's store in Philadelphia. Among others, those present included Martin Weiner, Lichtman and Sussman. Weiner testified that at this meeting he informed Sussman that the cloth was stolen, and explained the method by which it had been obtained. Sussman in turn assured those present that his part of the transaction was "perfectly safe." At this meeting the financial arrangements were made. All transactions were to be in cash to avoid the tracing which might be possible were checks used. Sussman suggested that all billing be done under the bogus name of "Samuel Miller."

That such plans were later carried out was shown by Sussman's admissions that the cloth was received without covering invoices, and that at his direction "Samuel Miller" invoices were printed and completed upon receipt of each shipment.

Testifying as to the meeting, Lichtman substantially corroborated the statements of Weiner. He questioned, however, whether Sussman was actually told at that time that the cloth was stolen. Lichtman stated that in August of 1955 he advised both Sussman and Nassau in detail as to the entire operation. Sussman then told Lichtman that he already knew about it, having learned thereof from a Mr. Chorney, an alleged co-conspirator. In this respect, Lichtman also testified that in April of 1955, Mr. Chorney was fully advised as to how the cloth

had been stolen from the Quartermaster Depot.

Chamberland, a co-conspirator who entered a plea of guilty, testified that while he was not a principal at the February, 1954, meeting, he overheard a conversation of Sussman, Weiner and Lichtman. In it, Chamberland said, each party assured the others that his part of the transaction was "safe." He said there was talk as to whether or not the cloth could be identified, and as to the fact that Sussman intended to export the cloth to avoid tracing. Chamberland added that sometime in 1954 he became suspicious about the cloth and questioned his employer, Robert Lichtman. Lichtman, he said, told him not only that the cloth was stolen but also that the New York purchasers were fully aware thereof from the very inception of their dealings.

In addition to such direct testimony of guilty knowledge, there were inferences of guilt raised by many acts of the defendants. The Quartermaster tickets, mill marks, proof or truth marks, were all removed from the stolen cloth in the presence of the defendants. Sussman and Nassau likewise forged the endorsement of "Samuel Miller" on the numerous checks made out in that name. Sussman also had an "extensively" greater quantity of uniform cloth for sale than anyone else during this period, and apparently could offer for sale some types of cloth which even the mills could not supply. The prices paid by Sussman and Nassau for the stolen cloth were likewise considerably below the current market.

To hold that the jury did not have a sufficient basis upon which to find the requisite guilty knowledge on the part of the defendants would be utterly unrealistic. No authority is needed for the proposition that the credibility of the witnesses was for the jury. Their decision should not be disturbed.

For the foregoing reasons, it is hereby ordered that the defendants' motions for new trial and for judgment of acquittal be and the same are denied.