FISWICK ET AL. *v.* UNITED STATES.

No. 51.   Argued November 19, 20, 1946.—Decided December 9, 1946.

212

*Frederic M. P. Pearse* argued the cause and filed a brief for petitioners.

*Leon Ulman* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington* and *Robert S. Erdahl.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Alien Registration Act of 1940, 54 Stat. 670, 8 U. S. C. § 451 *et seq.,* required aliens, with certain exceptions, to register pursuant to regulations of the Commissioner of Immigration and Naturalization.[1] Among the disclosures required was whether during the preceding five years the alien had been "affiliated with or active in (a member of, official of, a worker for) organizations, devoted in whole or in part to influencing or furthering the political activities, public relations, or public policy of a foreign government." [2]

Petitioners are German nationals who registered under the Act, the last of the three, Mayer, registering on December 23, 1940. Each stated when he registered that he was not affiliated with or active in such an organization. Each failed to disclose, in answer to another question pertaining to "memberships or activities in clubs, organizations, or societies," that he was in any way connected with the Nazi party. They were indicted in 1944 with 28 others for conspiring to defraud the United States in the exercise of its governmental functions (see *Curley* v. *United States,* 130 F. 1, 4) in violation of § 37 of the Criminal Code, 18 U. S. C. § 88.

---

[1] See 5 Fed. Reg. 2836 for the regulations.

[2] Regulations, *supra,* note 1, § 29.4 (1) (15).

The indictment charges that petitioners continuously between September 1, 1939, and the date the indictment was returned, September 13, 1944, conspired with each other and with Draeger, the German consul in New York City and leader of the Nazi party in this country, with Draeger's secretary, Vogel, and with other representatives of the Third Reich, to defraud the United States by concealing and misrepresenting their membership in the Nazi party. It charges that since 1933 the Nazi party was devoted to furthering the political activities and policy of the German Reich in this country, that each petitioner during the five years prior to his registration was a member of that party, that Draeger and Vogel directed petitioners in registering under the Act to conceal and falsify their connection with the Nazi party, that petitioners followed such directions, that after their registration they continued from day to day to misrepresent to the Government their connection with and activities in the Nazi party. The indictment alleges that, as a means of accomplishing the conspiracy, the petitioners appeared for registration and in registering falsely failed to disclose their connection with and activities in the Nazi party. The indictment sets forth forty overt acts. Many related to instructions given by Draeger and Vogel to various defendants from September to December 1940, in connection with their registration. Others related to the registering by petitioners in November and December, 1940. The last overt act alleged to have been committed by any of petitioners was the filing by Mayer of his registration statement on December 23, 1940.

Of the 31 indicted, only the three petitioners were convicted after a jury trial.[3] Fiswick and Rudolph were sen-

---

[3] Six entered pleas of guilty. There was a dismissal as to one, a severance as to fourteen. Ten were tried. The jury acquitted three and disagreed as to the other four.

tenced to imprisonment for eighteen months each. Mayer was sentenced to imprisonment for a year and a day. The judgments of conviction were affirmed by the Circuit Court of Appeals, one judge dissenting. 153 F. 2d 176. The case is here on a petition for a writ of certiorari which we granted because the rulings of the lower courts on the continuing nature of the conspiracy were apparently in conflict with decisions of this Court. See *United States* v. *Irvine*, 98 U. S. 450; *United States* v. *Kissel*, 218 U. S. 601.

*First.* The nature and duration of the conspiracy assumed great importance at the trial for the following reason. Each petitioner after he was apprehended made damaging statements to agents of the Federal Bureau of Investigation. Mayer, in November, 1943, stated that he had applied for membership in the Nazi party and had not disclosed the fact because Vogel told him not to. Fiswick's statement made in April, 1944, was to the same effect. Rudolph made substantially the same admissions in November, 1943, and then in September, 1944, retracted them insofar as he had said that in registering under the Act and in failing to disclose his Nazi party affiliation he had followed instructions. His later reason for non-disclosure was his asserted desire to protect his family. Each of these statements was admitted at the trial. At first, each was admitted only as against the maker. At the close of the Government's case, however, the District Court ruled that each of these statements was admissible against each of the other co-conspirators. It so charged the jury. Later the jury returned to the courtroom for further instructions. One of the questions on which the foreman stated that they desired instruction related to that part of the charge "where you said something about all of the defendants were bound by the act of one or something, something as a group, and the other said the individuals."

The judge then repeated that the admissions of each were admissible against all provided there was a conspiracy and they were all in it.

The Solicitor General now rightly concedes that that ruling was erroneous. Though the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one. See *United States* v.. *Irvine, supra.* Continuity of action to produce the unlawful result, or as stated in *United States* v. *Kissel, supra,* p. 607, "continuous coöperation of the conspirators to keep it up," is necessary. A conspiracy is a partnership in crime. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 253. Under § 37 of the Criminal Code, the basis of the present indictment, an overt act is necessary to complete the offense.[4] The statute of limitations, unless suspended,[5] runs from the last overt act during the existence of the conspiracy. *Brown* v. *Elliott,* 225 U. S. 392, 401. The overt acts averred and proved may thus mark the duration, as well as the scope, of the conspiracy.

In this case the last overt act, as we have noted, was the filing by Mayer of his registration statement on December 23, 1940. That act was adequate as an overt act in furtherance of a conspiracy to make a false return. But there is difficulty in also making it serve the function of an overt act in furtherance of a conspiracy to conceal from 1940 to 1944 the fact that false returns had been

---

[4] At common law it was not necessary to aver or prove an overt act. See *Hyde* v. *United States,* 225 U. S. 347, 359. The same is true under the Sherman Act. *Nash* v. *United States,* 229 U. S. 373, 378; *United States* v. *Socony-Vacuum Oil Co., supra,* p. 252. But § 37 of the Criminal Code requires not only an agreement to do the unlawful act but also the doing of "any act to effect the object of the conspiracy." See *Hyde* v. *United States, supra,* p. 359.

[5] See, for example, § 1 of the Act of August 24, 1942, 56 Stat. 747, 18 U. S. C. Supp. II, § 590a, as amended by § 19 (b) of the Act of July 1, 1944, 58 Stat. 649, 667, 18 U. S. C. Supp. IV, § 590a.

made. All continuity of action ended with the last overt act in December, 1940. There was no overt act of concealment which followed the act of making false statements. If the latter is permitted to do double duty, then a continuing result becomes a continuing conspiracy. If, as we think, the conspiracy charged and proved did not extend beyond the date of the last overt act, the admissions of each petitioner were improperly employed against the others. While the act of one partner in crime is admissible against the others where it is in furtherance of the criminal undertaking, *Pinkerton* v. *United States,* 328 U. S. 640, 646–647, and cases cited, all such responsibility is at an end when the conspiracy ends. *Logan* v. *United States,* 144 U. S. 263, 309; *Brown* v. *United States,* 150 U. S. 93, 98. Moreover, confession or admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise. It is rather a frustration of it. If, as the Circuit Court of Appeals thought, the maintenance of the plot to deceive the Government was the objective of this conspiracy, the admissions made to the officers ended it. So far as each conspirator who confessed was concerned, the plot was then terminated. He thereupon ceased to act in the role of a conspirator. His admissions were therefore not admissible against his erstwhile fellow-conspirators. *Gambino* v. *United States,* 108 F. 2d 140, 142–143.

It is earnestly argued, however, that the error was harmless. The "harmless error" statute (Judicial Code § 269, 28 U. S. C. § 391) provides that "On the hearing of any appeal, certiorari, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." We have recently reviewed the history of this statute and the func-

tion it was designed to serve in criminal cases. *Kotteakos v. United States,* 328 U. S. 750. The Court there stated, pp. 764–765:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

We cannot say with fair assurance in this case that the jury was not substantially swayed by the use of these admissions against all petitioners. It is not enough to say that there may be a strong case made out against each petitioner. The indictment charges a conspiracy, not the substantive crime of falsely registering. The evidence that petitioners conspired with each other and with Draeger, Vogel, and others, is not strong. Though we assume there was enough evidence to go to the jury on the existence of that conspiracy, the case was one which a prosecutor would be anxious to bolster.

The prosecutor's case, apart from the admissions, may be briefly summarized. Draeger and Vogel were active in the affairs of the Nazi party in this country. Their stenographer, a government witness, testified that applications for membership in the party were received at their

office. Dues were paid there. A card file of members of the party and of applicants for membership was kept there. The name of each petitioner was on the list. A letter was sent to all on the list in August or September, 1940, over Draeger's signature, requesting them to discuss a matter with Draeger. Those who appeared in response to the letter were told to conceal their Nazi party membership or affiliation when they registered under the Act. Another witness for the Government—a defendant in the case who was granted a severance—also testified that Vogel gave instructions to party members not to disclose their affiliation with the Nazi party. And a clerk in Draeger's office testified for the Government that the party members who came to the consulate were told to say in their registration statements that they were members of an innocuous-sounding association of German nationals. There was no evidence that petitioners came to the consulate seeking advice. There was no *direct* evidence that petitioners had received the instructions from the consulate to conceal their party membership. There was no *direct* evidence that petitioners came to the consulate in response to the letter which was sent. They were not identified as being with any group which called there. There was no evidence that they conferred with Draeger or Vogel or with each other.

The Solicitor General states with commendable candor that in this state of the proof it was manifestly important for the prosecutor "to bring into the case against petitioners evidence of a character that might better convince the jury that when each failed to reveal his Party connection in registering he had done so upon Party instructions, and, hence, that he was a member of the conspiracy." The admissions served that purpose. They supplied the first direct evidence that petitioners acted pursuant to the instructions of the consulate. It is true,

as respondent emphasizes, that none of these admissions implicates any petitioner except the maker. But since, if there was a conspiracy, Draeger and Vogel were its hub, evidence which brought each petitioner into the circle was the only evidence which cemented them together in the illegal project. And when the jury was told that the admissions of one, though not implicating the others, might be used against all, the element of concert of action was strongly bolstered, if not added. Without the admissions, the jury might well have concluded that there were three separate conspiracies, not one. Cf. *Kotteakos* v. *United States, supra.* With the admissions, the charge of conspiracy received powerful reinforcement. And the charge that each petitioner conspired with the others became appreciably stronger, not from what he said but from what the other two said. We therefore cannot say with any confidence that the error in admitting each of these statements against the other petitioners did not influence the jury or had only a slight effect. Indeed, the admissions may well have been crucial. The admissions apparently became of considerable importance in the deliberations of the jury, for, as we have noted, they asked for clarification of the instructions on that point. And the admissions so strongly bolstered a weak case that it is impossible for us to conclude the error can be disregarded under the "harmless error" statute. The use made of the admissions at the trial constituted reversible error.

*Second.* A further question remains. As we have noted, Fiswick was sentenced to imprisonment for 18 months. No fine was imposed. It now appears that he has served his sentence. Accordingly, it is suggested that the cause is moot and that the writ of certiorari should be dismissed as to him. We followed that procedure in *St. Pierre* v. *United States,* 319 U. S. 41, 42, saying that since the sentence had been served, "there was no longer a sub-

ject matter on which the judgment of this Court could operate." We added, however, that the petitioner had not shown that "under either state or federal law further penalties or disabilities can be imposed on him as a result of the judgment which has now been satisfied." P. 43.

The situation here is different. Fiswick is an alien. An alien sentenced to imprisonment for one year or more "because of conviction in this country of a crime involving moral turpitude" is, unless pardoned, subject to deportation if the crime was committed within five years after the alien's entry into the United States. 39 Stat. 874, 889, 8 U. S. C. § 155. The conspiracy with which Fiswick is charged was formed and executed within that five-year period, as his last entry was in 1937. The conspiracy of which he was convicted was one to impede the Government in one of its lawful functions, to prevent it from obtaining information which the Executive and Congress deemed vital to our internal security, to conceal by fraud, deceit, and perjury [6] the ramifications of an organization in our midst bent on our undoing. We need not determine in this collateral way whether conviction for such a crime would involve "moral turpitude" within the meaning of the deportation laws.[7] But the judgment, if undisturbed, stands as unimpeachable evidence that Fiswick com-

[6] The registration statements required by the Act were sworn statements. Regulations, *supra* note 1, § 29.4 (g), (j).

[7] Convictions for perjury, *Kaneda* v. *United States*, 278 F. 694, for frauds on the revenues, *Guarneri* v. *Kessler*, 98 F. 2d 580, *United States* v. *Reimer*, 113 F. 2d 429, for frauds with respect to property, *United States* v. *Burmaster*, 24 F. 2d 57, have been held by the lower courts to meet that test. And counterfeiting was so classified by the Court in *United States* v. *Smith*, 289 U. S. 422. As to deportation for violations of the Alien Registration Act of 1940 see § 20 (b) (4) and (5). See also Alien Enemy Act of 1798, Rev. Stat. 4067–4070, as amended 40 Stat. 531, 50 U. S. C. §§ 21–24; Presidential Proclamation No. 2655, 10 Fed. Reg. 8947.

mitted the crime charged. The hazards of deportation because of that fact are real.[8] To leave him to defend a deportation order on the ground that the crime of which he was convicted did not involve "moral turpitude" is to add to his burdens by depriving him of his best defense— that he was not properly convicted.

Moreover, other disabilities or burdens may flow from the judgment, improperly obtained, if we dismiss this case as moot and let the conviction stand. If Fiswick seeks naturalization, he must establish that during the five years immediately preceding the date of filing his petition for naturalization he "has been and still is a person of good moral character." 54 Stat. 1137, 1142, 8 U. S. C. § 707 (a) (3). An outstanding judgment of conviction for this crime stands as ominous proof that he did what was charged and puts beyond his reach any showing of ameliorating circumstances or explanatory matter that might remove part or all of the curse. And, even though he succeeded in being naturalized, he would, unless pardoned, carry through life the disability of a felon; [9] and by reason of that fact he might lose certain civil rights.[10] Thus Fiswick has a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him. In no practical sense, therefore, can Fiswick's case be said to be moot.

[8] Although deportation is not technically a criminal punishment, it may visit great hardship on the alien. *Bridges* v. *Wixon,* 326 U. S. 135, 147. As stated by the Court, speaking through Mr. Justice Brandeis, in *Ng Fung Ho* v. *White,* 259 U. S. 276, 284, deportation may result in the loss "of all that makes life worth living."

[9] "All offenses which may be punished by death or imprisonment for a term exceeding one year shall be deemed felonies." Criminal Code § 335, 18 U. S. C. § 541.

[10] Thus Mo. Rev. Stats. Ann. § 4561 renders such person incompetent to serve on a jury and forever disqualifies him from voting or holding office, unless pardoned.

It is said, however, that, having served his sentence, Fiswick may not be resentenced on a new trial and that, if his conviction is reversed, he thereby escapes deportation. The argument is that he thwarts the deportation policy by electing to serve his sentence. We cannot assume, however, that Fiswick is guilty of the conspiracy charged. He was not accorded the trial to which he is entitled under our system of government. The conviction which he suffered was not in accordance with law. The errors in the trial impeach the conviction; and he must stand in the position of any man who has been accused of a crime but not yet shown to have committed it. To dismiss his case as moot would permit the Government to compound its error at Fiswick's expense. That course does not comport with our standards of law enforcement.

*Reversed.*