[Crim. No. 896.   Fourth Dist.   Oct. 21, 1955.]

THE PEOPLE, Respondent, v. W. E. McKIBBEN et al., Defendants; WALTER BROCKIE et al., Appellants.

Thomas Higgins, Jr., for Appellants.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendants W. E. McKibben and Addison B. Carter, partners in the Downey Rabbit and Poultry Company, together with defendants and appellants Walter Brockie, Frank Harms and Donovan Ritz, were indicted and charged in count one with theft of chickens from one Ernest Smith; in count two, with theft of turkeys from Frank Browning; in count three, with theft of turkeys from Jack Davis, all exceeding $50 in value; and in count four, with conspiracy to commit the crime of theft in carrying away the chickens of Smith, as charged in count one. Each defendant pleaded not guilty. At the conclusion of the People's case, upon motion of the district attorney, the charges against defendant Carter were dismissed. A directed verdict of not guilty followed as to defendant McKibben. The remaining defendants and appellants herein were found guilty on counts one and four, and not guilty on the remaining counts. Motions for new trial were denied, and defendants were committed to state's prison. Subsequently the order was vacated as to appellant Ritz and he was committed to the California Youth Authority.

On February 24, 1955, Smith, owner of a poultry ranch at Kingsburg, was approached by a feed salesman in reference to the sale of some chickens, and Smith agreed to the sale. That night a truck belonging to the poultry company above mentioned, arrived at the public scales in Kingsburg and Smith drove from his ranch, which was about 3 miles distant, and met it there, as per agreement. The supposedly empty truck was weighed. Smith preceded it in his car and the two truck drivers, one identified as appellant Brockie, drove to Smith's ranch, loaded the truck with chickens and returned to the scales with Smith, who preceded him. The loaded truck was again weighed. The system agreed upon was to weigh the truck in, unloaded, and weigh it out again loaded and pay Smith the difference in weight, as representing the weight of the chickens, and the poultry company would then pay for the chickens at the rate of 29 cents per pound, the fair market value. The weight slip showed the truck weighed 17,600 pounds loaded and 10,530 pounds supposedly empty. Arrangements were made for another delivery, as a part of

that sale, on the night of February 27th, and Smith was to meet them at the scales about 7 p. m. On Smith's return to his ranch on the night of February 24th, he saw a large rock (about 8 or 10 inches in diameter) in the road, which was foreign to that part of the valley and which was not there when he preceded the truck to the scales that evening. He then drove down the road slowly and saw additional rocks similar in character and weight, strewn alongside of the road. He called the officers and together they picked up three of the larger rocks. These parties, together with the officers of the Department of Weights and Measures, then laid a plan to observe the truck driver who was to arrive on February 27th for the remaining chickens for which they had previously bargained. That evening they observed a Chevrolet truck and a GMC truck parked near a café in Kingsburg. The occupants of the trucks entered the café. The officers examined the trucks and nothing unusual was found in respect to the Chevrolet but behind the seat of the GMC truck, in a space 18 inches wide and extending across the width of the truck were rocks piled up about even with the seat. This space was ordinarily occupied by a seat tank for gasoline. There were 12 or 14 such rocks measuring 6 to 12 inches in diameter, which were covered with a pair of overalls. Appellant Ritz came out of the café and asked one of the officers what was going on, and the officer remarked to Ritz that he had parked too near a fire plug. He was asked about the ownership of the truck and Ritz said he was not the driver nor the owner but the driver was in the café and would move it. Three men came out, got in the trucks and went to the scales without removing the rocks. Smith acted as weighmaster, weighed the respective trucks, and preceded them to his ranch. The Chevrolet followed immediately behind the Smith car. Officers were concealed along the road. As one truck went by one of the officers a big rock came out of the window and struck the ground near him. The forms of the two men were seen in the GMC truck and another rock was thrown from it out of the window at another point on the road. Photographs were immediately taken of the rocks and the officers again took up their same positions. Smith and the trucks returned in the same formation to the scales. They were weighed and weight slips were given to Smith. The occupants of the truck started to leave but were detained by the officers. Appellant Ritz was, at that time, driving

the Chevrolet truck and Brockie was with him. Appellant Harms was then driving the GMC truck. The rocks had all been removed from it. Samples were taken of some of the rock debris behind the seat. The truck belonged to the poultry company. Harms was asked if he knew how the rocks were removed from behind the seat. He said the seat was moved forward and the person riding in the seat with him leaned over the back of the seat, lifted the rocks onto it and then threw them out the window. He was asked if he would sign a statement to that effect and he wrote: "Don Ritz rode with me and cast the rocks from the truck to and from these scales." At the Chevrolet, in the presence of appellant Brockie, Ritz was asked if he was on the GMC truck at that time and he said he was. Ritz asked why they were being stopped and he was told the officers had inspected his truck before it was weighed in and that there were rocks in it at that time. Ritz then signed a statement that he rode with Harms going from the scales to the ranch.

The officers placed appellants under arrest. Smith, through the local feed agent who had arranged for the sale, telephoned to Downey Poultry House in Downey and demanded the money for the chickens, as determined by the weight receipts, before he would release the chickens, and stated that this money was to apply on account of the money due him. Apparently, through some arrangement made with the feed agent, Smith then received a check for this amount.

On February 28th, additional rocks were found between the scales and the Smith ranch on sandy soil, to which these, or any other rocks, were foreign. Photographs were taken of them and they weighed 294 pounds.

As further evidence of the claimed conspiracy and for the purpose of establishing proof of the additional counts and also showing system, scheme, design and intent, there was testimony that on August 22, 1954, Jack Davis made similar arrangements with the Downey Rabbit and Poultry Company to sell two loads of turkeys. Two trucks and three men, two of whom were appellants Ritz and Brockie, met him at the scales and weighed in the trucks. They were led to the ranch by Davis and after loading, returned in the same fashion to the scales. The next morning Davis and an officer found 43 foreign rocks weighing 526½ pounds, along the roadside.

On October 4, 1954, there was a similar occurrence in respect to Frank Browning, who lived near Porterville. He called the poultry company and said a Mr. "McKibeen"

answered and they agreed to sell and buy four truckloads of turkeys. About 10:30 at night Browning met them at the scales, weighed the trucks and proceeded to his ranch. Appellants Ritz and Brockie were with the trucks on that occasion. The next morning Browning saw four large foreign rocks in the olive grove near his turkey pens and footprints led to them from the place where the parked trucks were being loaded. Other rocks were found on the road leading to his ranch. In all they totaled in weight about 248 pounds.

The prosecution offered in evidence the admissions and confession of appellant Ritz, a portion of which had been reduced to writing and signed by him. It was obtained in the jail after the arrest of all defendants and apparently after the crimes charged had been committed and after the conspiracy, if any, had terminated. Objection was made thereto by both appellants Brockie and Harms on the ground it was not admissible as to them. The trial court had previously ruled properly on the previous statements made by these several defendants, i. e., that it was only admissible against the party making it, but on this occasion overruled the objection and held that the statement was admissible against all appellants.

The attorney general concedes error in this respect as to certain portions of them as applying to appellants Brockie and Harms, and cites *Fiswick* v. *United States,* 329 U.S. 211, 217 [67 S.Ct. 224, 227, 91 L.Ed. 196], stating:

"Moreover, confession or admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise. It is rather a frustration of it. . . . (The co-conspirator's) admissions were therefore not admissible against his erstwhile fellow-conspirators."

See also *People* v. *Oldham,* 111 Cal. 648, 653 [44 P. 312]; *People* v. *Aleck,* 61 Cal. 137; *People* v. *Doble,* 203 Cal. 510 [265 P. 184]; and *People* v. *Roberts,* 40 Cal.2d 483 [254 P.2d 501], cited by appellants. The prosecution, however, argues that under article VI, section 4½ of the Constitution, no prejudicial error resulted.

These statements and the confession were to the effect that Ritz had been working for the Downey Company for about one and a half years; that such thefts, by the means above indicated, had been going on during that period "more than 50" times, not only in the San Joaquin Valley but in certain Southern California counties; that appellant Walter Brockie had been working there for over two years, was more or less a boss

over him, and gave orders as to the plan to be carried out; that Harms worked there six months and that they both had been engaged in these thefts with him over these periods; that he and Harms were paid $20 per night for their services, whether the thefts were carried out or not, and Brockie was paid $100 per week; that defendant McKibben indicated to Brockie the weight that should be added to the trucks in the form of rocks but that he did not believe defendant Carter knew what was going on. He described his trip to the Smith ranch on the night of February 27th with appellants Brockie and Harms. He said Harms was driving the GMC truck in which he was riding and that Brockie was driving the other one; that the GMC had rocks stacked up in an encasement as described by the officers; that the three of them picked up about 300 pounds of rocks near the side of the road on the Ridge Route, and each helped load them; that after weighing the trucks they proceeded as described by Smith because they did not want Smith to see them throw the rocks out as they approached the ranch; that when they reached the scales to weigh the chickens all rocks had been disposed of along the roadside. He said he remembered the Davis turkey transaction; and that he, Brockie and Harms participated. He also remembered the Browning theft of turkeys committed in the same fashion and said they also participated in that transaction and that rocks were loaded and unloaded by the same appellants and that one of them remarked about taking some rocks over into an olive grove at the time.

The claim that no corpus delicti was established before admitting extrajudicial admissions of the accused because it was not sufficiently shown that the value of the chickens taken exceeded $50 is without merit. The evidence and proper inferences that might be drawn therefrom indicate that the weight of the rocks disposed of on that occasion, multiplied by the value of the chickens taken by the scheme was in excess of $50. There was sufficient independent evidence of the conspiracy and of the substantive charge of grand theft, without the aid of the admissions or confessions of the coconspirators. (*People* v. *Collier*, 111 Cal.App. 215 [295 P. 898].)

The admissions and confessions were clearly admissible as to appellant Ritz and the evidence fully supports his conviction on both counts. (*People* v. *Madsen*, 93 Cal.App. 711 [270 P. 237]; *People* v. *Moran*, 144 Cal. 48, 53 [77 P. 777].)

In *People* v. *Curtis*, 106 Cal.App.2d 321, 325 [235 P.2d 51],

the court carefully considered the rules governing admissions of acts and declarations of coconspirators, and said:

"Generally, the hearsay rule prohibits the reception in evidence of the acts done and the declarations made by one defendant, out of the presence of his codefendant, against such codefendant . . ." and cites sections 1870, subdivisions 6 and 7 and 1850 of the Code of Civil Procedure to the effect that after proof of a conspiracy the act or declaration of a conspirator against his coconspirator, and relating to the conspiracy, may be given upon a trial where the declaration, act, or omission forms a part of a transaction which is itself the fact in dispute or evidence of that fact. (See also *People* v. *Collier, supra,* p. 240.)

A close question therefore presents itself as to whether certain of the admissions and statements made by Ritz, involving appellants Harms and Brockie, even though erroneously admitted, were so prejudicial as to compel a reversal of their convictions.

Considering the properly admitted evidence in its entirety, the proof of guilt of these two appellants seems to us to be so clear that even had the error complained of not occurred, it does not seem probable that a different verdict would have been rendered. No miscarriage of justice appears to have occurred. (Const., art. VI, § 4½.)

Judgments and orders affirmed.

Barnard, P. J., concurred.