UNITED STATES, Appellee

v

OTTO G. SALISBURY, Ship's Serviceman Second
Class, U. S. Navy, Appellant

14 USCMA 171, 33 CMR 383

No. 16,718

August 2, 1963

Lieutenant John L. Ostby, USMC, argued the cause for Appellant, Accused. With him on the brief was Commander F. L. Forshee, USN.

Major Daniel F. McConnell, USMC, argued the cause for Appellee, United States. With him on the brief were Commander Benjamin H. Berry, USN, and Commander John D. Moroney, USN.

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at the United States Naval Station, San Diego, California, by the Commandant, Eleventh Naval District, the accused pleaded not guilty to charges of conspiracy, signing a false official record, larceny, and bribery, in violation, respectively, of Uniform Code of Military Justice, Articles 81, 107, 121, and 134, 10 USC §§ 881, 907, 921, and 934. He was acquitted of the bribery count, but otherwise found guilty and sentenced to confinement at hard labor for twelve months, forfeiture of $35.00 per month for a like period, and reduction. The convening authority approved the sentence. The board of review affirmed only so much thereof as provided for confinement and forfeitures for nine months, and reduction. We granted accused's petition for review on the question whether evidence of acts by his co-conspirators, committed subsequent to the accomplishment of the object of the conspiracy, were admissible against him. Necessarily, we also reach the issue of the sufficiency of the evidence to sustain the findings of guilty of signing a false official record.

### I

The incidents giving rise to the charges occurred on board the U.S.S. PIEDMONT. Accused was in charge of the night shift of the ship's laundry. One Ellis was responsible for the ship's service bulk stores, and one La Joie ran the ship's service soda fountain. All these activities were under the supervision of Lieutenant Whittington, who was assisted by Petty Officer Holzmeister.

The ship's service store aboard the PIEDMONT sold both tax paid and "sea store" (tax free) cigarettes. The latter were purchasable only through the soda fountain. Bulk merchandise of this nature was normally obtained by the fountain manager, La Joie, by filling out a "973" requisition which was submitted to Ellis via Holzmeister and approved by Lieutenant Whittington. Holzmeister recorded the issue of the tax free cigarettes on his stock control cards, and the form was duly filed in the safe, with Ellis retaining

a copy to account for his "shipment" to La Joie at the soda fountain.

Cigarettes were sold at the fountain for cash and, except for excess change (usually in coins), the money was kept in a cash register. All sales were recorded on the register's tape, which was required to be read daily by the disbursing officer, who also removed the funds from it and furnished La Joie with a receipt. A change fund of approximately $50.00 was left in the register.

There was some laxity in supply discipline, however, and these procedures were not always followed.

On the night of November 12, 1961, while the ship was moored in Subic Bay, Salisbury approached Seaman Genn, who was standing watch on the PIEDMONT's fantail, and offered to pay him $10.00 in return for his cooperation while certain objects were removed from the ship. Genn agreed, and in order to facilitate the transaction, assumed his successor's watch. During this period, he observed Salisbury, La Joie, and Ellis bring up from below several laundry bags filled with boxes. The boxes were removed from the bags by Ellis and La Joie and lowered over the side by Salisbury. He noticed watchstanders on nearby destroyers pointing under the PIEDMONT's fantail as the boxes were being removed from the ship.

After Salisbury had lowered the last box, Genn observed an "outrigger" canoe operated by Filipinos pull away from the PIEDMONT. He was able to read the word "Chesterfield" on one of the boxes which it carried. He also noted that the other boxes bore brightly colored printing and, in court, identified a Chesterfield cigarette case as similar to that which he had seen on the night in question. On the following morning, he received the sum of twenty pesos from Salisbury, who "peeled" them from a large roll of similar banknotes.

Genn eventually made known what had transpired on the evening of November 12, and, on the morning of November 14, 1961, an inventory of the bulk stores was conducted. It dis-

closed a shortage of ten cases of sea store cigarettes, seven of which were Pall Malls and three of which were Chesterfields. A second inventory, completed by 2:30 p.m., verified the shortage.

Ellis was then directed to check his locker and work area to make certain that he had not inadvertently retained an issue slip which should have been on file with Holzmeister and which would account for the missing cigarettes. He returned with a retained copy of a "973" establishing the issue of the ten cases of cigarettes to the soda fountain. The original was then "discovered" in the soda fountain. Neither bore the requisite approval for issue of the cigarettes.

Holzmeister entered the "issue" on his records, thereby causing the cigarette inventory to balance and eliminating the shortage. A discrepancy, however, was created in the soda fountain's accounts in the amount of $500.00, the value of the cigarettes allegedly issued to it. Between 5:30 p.m. and 6:30 p.m., La Joie accounted for this shortage by "finding" $500.00 in a cigar box underneath the fountain. This sum was not reflected on the cash register tape and had never been rung up as a sale. In and of itself, it reflected a sum far in excess of an ordinary day's receipts at the fountain.

The "973" issue slip bore the signatures of Ellis and La Joie, and there is nothing in the record which connects accused with its preparation or use. Holzmeister testified, however, that accused, on a pretext, called him to one side during the attempt to reconcile the shortages and asked for his assistance. Holzmeister, knowing what had occurred on the fantail, curtly refused. He admitted that accused did not specify the nature of the aid which he desired and, for aught he knew, was referring to legitimate problems in the laundry.

## II

The issues before us deal with the admissibility of the evidence relating to the "973" issue slip and the sufficiency of the proof to establish accused's criminal responsibility for its false

**173**

making. It is conceded that he did not actually sign the "973" and that there is no evidence which directly links him with its execution. The Government urges, however, that, as the evidence establishes an incomplete conspiracy to steal the cigarettes at the time of the signing of the "973," the criminal responsibility of Ellis and La. Joie was imputable to Salisbury. Hence, it contends that the evidence of the slip's making and use is admissible and sufficient, in light of the other evidence regarding the conspiracy, to sustain the pertinent findings of guilty.

The principles applicable to the situation before us are quite clear. In United States v Miasel, 8 USCMA 374, 24 CMR 184, we declared, at page 378:

"The law is well settled that the acts and declarations of a conspirator or co-actor, pursuant to, and in furtherance of, an unlawful combination or crime, are admissible against all co-conspirators or co-actors during the existence of the conspiracy. Delli Paoli v United States, 352 US 232, 77 S Ct 294, 1 L ed 2d 278; Clune v United States, 159 US 590, 16 S Ct 125, 40 L ed 269; Logan v United States, 144 US 263, 12 S Ct 617, 36 L ed 429."

In *Miasel* supra, the question before us was the propriety of the board of review's action in reversing the accused's conviction and ordering a rehearing when it appeared that evidence of certain acts by co-conspirators was received after accused had affirmatively withdrawn from the criminal combination. In sustaining the board's action, we pointed out that the critical issue was whether accused was still a part of the enterprise when the acts were committed. Thus, we said, at page 378:

"In order to permit evidence concerning the incident which occurred after the group departed the barracks to be admissible against the accused, it must be shown that he had continued to associate himself and be connected with the common enterprise or venture. *For once a joint enterprise has ended, either as a result of accomplishment of the objec-*

*tive, abandonment, or withdrawal of any of the members of the group, subsequent acts and declarations can affect only the actor or declarant.* Fiswick v United States, 329 US 211, 67 S Ct 224, 91 L ed 196; Krulewitch v United States, 336 US 440, 69 S Ct 716, 93 L ed 790; Delli Paoli v United States, supra; Logan v United States, supra." [Emphasis supplied.]

Acts, however, which are not intended to be a means of expression and which are relevant to prove the existence of a conspiracy may be received in evidence without regard to whether the combination was ended prior to their commission. Lutwak v United States, 344 US 604, 97 L ed 593, 73 S Ct 481 (1953). This is but an application of familiar principles of relevancy and materiality. Cf. Manual, supra, paragraphs 137, 138. In the cited case, Lutwak and others were charged with conspiring to defraud the United States by obtaining the illegal entry of alien "war brides" after contracting sham marriages with them. Although it was found that the conspiracy had terminated by December 1947, the Court held admissible evidence of subsequent acts such as uncontested divorce actions and separation of the purported couples. In so ruling, it declined to follow an earlier *dictum* in Logan v United States, 144 US 263, 36 L ed 429, 12 S Ct 617 (1892), and distinguished between proof of acts and proof of declarations. The former, said the Court, were competent if relevant, even though the conspiracy had ended, while the latter stood on a different footing:

". . . Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. [Citations omitted.] But such declaration can be used against the co-conspirator only when made in furtherance of the conspiracy. [Citations omitted.] There can be no furtherance of a conspiracy that has

174

ended." [344 US, supra, at page 617.]

It is acts rather than declarations with which we are confronted here. And, unlike the sordid post-conspiratorial episode which was involved in United States v Miasel, supra, the preparation and attempted use by Ellis of the "973" as well as the production of the $500.00 by La Joie tended to establish the existence of their conspiratorial arrangement with accused. The Government had otherwise established the trio's participation in the actual disposition of the cigarettes to the Filipinos and the fact that ten cases were missing from the ship's inventory. The preparation by two of the men of the palpably false document and their sudden "discovery" of the proper sum of money to cover the purported sale of the cigarettes goes far in coloring their earlier joint effort with Salisbury. The existence of a conspiracy may be proven as well by circumstantial evidence as by direct. Delli Paoli v United States, 352 US 232, 1 L ed 2d 278, 77 S Ct 294 (1957); Blumenthal v United States, 332 US 539, 92 L ed 154, 68 S Ct 248 (1947); United States v Miasel, supra, at page 378. Here, the acts of Ellis and La Joie during the attempt to resolve the shortage were highly relevant to establish the nature of their combination and, as such, were admissible in evidence without regard to whether the conspiracy had then terminated.

### III

Admissibility of the evidence of the conspiracy charge does not end the problem, for there remains the important question whether, taken together with the other proofs, it suffices to establish accused's guilt of signing the false official record, in violation of Code, supra, Article 107. The theory of the United States seems to be that sufficiency may be predicated upon either participation as an aider and abettor or that the document's preparation and use was an act in pursuance of the conspiracy which was still executory. Either concept involves imputed re-

sponsibility and the two theories are closely intertwined in the law. Pinkerton v United States, 328 US 640, 90 L ed 1489, 66 S Ct 1180 (1946); Nye and Nissen v United States, 336 US 613, 93 L ed 919, 69 S Ct 766 (1949); United States v Jackson, 6 USCMA 193, 19 CMR 319, concurring opinion of Judge Brosman. The evidence, however, offers no basis for concluding that the accused aided or abetted in the signing of the false record, and the issue of his liability depends upon whether the evidence establishes it to have been a part of a continuing conspiracy. The question of the conspiracy's termination is, therefore, squarely presented.

Every member of a conspiracy is responsible for acts done by his confederates which follow incidentally as one of the probable and natural consequences in the execution of the common design, even though such a consequence was not intended as a part of the original design or common plan. Boyd v United States, 142 US 450, 35 L ed 1077, 12 S Ct 292 (1892); 11 Am Jur, Conspiracy, § 8. As Mr. Justice Douglas noted in Pinkerton v United States, supra, at page 646:

". . . [S]o long as the partnership in crime continues, the partners act for each other in carrying it forward. It is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.' United States v Kissel, 218 US 601, 608, 54 L ed 1168, 1178, 31 S Ct 124, 126. Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective. . . . The governing principle is the same when the substantive offense is committed by one of the conspirators in furtherance of the unlawful project. Johnson v United States (CCA 9th) 62 F2d 32, 34. The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime."

A different case arises, however, when

**175**

"the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Pinkerton v United States, supra, at page 647. And, when "a joint enterprise has ended . . . subsequent acts and declarations can affect only the actor." United States v Miasel, supra, at page 378; Fiswick v United States, 329 US 211, 91 L ed 196, 67 S Ct 224 (1946).

In determining the time at which a conspiracy ended, one consideration, albeit not necessarily con-▆▆▆▆▆▆ ▆ trolling, is the date of the last overt act which is alleged. Fiswick v United States, supra, at pages 216–217; Lutwak v United States, supra, at page 616. Here, the conspiracy charged was one to commit the crime of larceny on or about November 12, 1961, and the single overt act alleged was the taking of the cigarettes from storage and lowering them over the PIEDMONT'S fantail. The signing of the false official record occurred two days later. Thus, the act which sought to be vicariously made a part of the accused's responsibility not only was committed after the last overt act alleged but also after the central object of the conspiracy, i.e., the larceny of the cigarettes, had been attained. And there is in the record no evidence upon which to base a conclusion that the accused played any part in this later attempt to conceal the earlier taking. Cf. Ferina v United States, 302 F2d 95 (CA 8th Cir) (1962). But, argues the Government, implicit in the conspiracy to steal the cigarettes was the need to cover up the resultant shortage. The unlawful agreement accordingly continued until the "973" was prepared. Hence, its signing and production was in the scope of the combination.

That is precisely the reasoning which the Supreme Court rejected in Krulewitch v United States, 336 US 440, 93 L ed 790, 69 S Ct 716 (1949), and the Lutwak case, supra.

176

In the former case, in order to sustain the introduction of declarations made by defendants' co-conspirator after attainment of the conspiracy's objective, the United States argued that unlawful combinations always imply a criminal agreement to collaborate with each other in order to prevent detection of the crime which was the central objective of the conspiracy. Expressly rejecting the Government's argument, the Court declined to extend the doctrine of conspiracy so far, and in an excellent concurring opinion, Mr. Justice Jackson succinctly pointed out:

"I suppose no person planning a crime would accept as a collaborator one on whom he thought he could not rely for help if he were caught, but I doubt that this fact warrants an inference of conspiracy for that purpose. Of course, if an understanding for continuous aid had been proven, it would be embraced in the conspiracy by evidence and there would be no need to imply such an agreement. Only where there is no convincing evidence of such an understanding is there need for one to be implied." [Krulewitch, supra, 336 US at page 455.]

We, too, reject the Government's contention that the unlawful combination between Salisbury, ▆▆▆▆▆▆ ▆ Ellis, and La Joie implied a continuing agreement to conceal their larceny. Krulewitch v United States, supra; Lutwak v United States, supra. So to enlarge the scope of the offense would make it difficult, if not impossible, to ascertain the terminal point of the crime. And it would broaden the admission of otherwise hearsay declarations by co-conspirators until there would be no end to what might be received. We prefer, therefore, to follow the soundly reasoned precedents of the Federal System rather than to accept the argument that there is always a continuing conspiracy to conceal one's crimes.

As noted above, the signing of the false official record by Ellis and La Joie occurred two days after the objective of the conspiracy had been attained. The cigarettes had been stolen and re-

moved from the PIEDMONT. The compliant watchstander had received his share of the proceeds. In short, the last alleged overt act had occurred, and all evidence points to the fact that the conspiracy was at an end. Liability for Ellis' and La Joie's act may not, therefore, he imputed to Salisbury, and there is no evidence which otherwise connects him with the signing of the "973." Accordingly, the evidence is insufficient to establish his guilt of that offense, and the findings with respect thereto must be set aside. Lutwak v

United States, supra; Krulewitch v United states, supra. The findings of guilty of Charge IV and its specification are set aside.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Navy. The board of review may reassess the penalty on the basis of the remaining findings of guilty.

Chief Judge QUINN and Judge KILDAY concur.