UNITED STATES, Appellee

v

MARTIN HAROLD BEVERLY, Seaman, U. S. Navy, and
EARL RANDOLPH GARTLEY, Seaman, U. S.
Navy, Appellants

14 USCMA 468, 34 CMR 248

*Lieutenant John Thomas Montag*, USNR, argued the cause for Appellants, Accused. With him on the brief were *Lieutenant Colonel Charles B. Sevier*, USMC, and *Lieutenant Thomas J. Hilligan*, USNR.

*Major Daniel F. McConnell*, USMC, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel D. E. Holben*, USMC, *Lieutenant H. M. Jame*, USNR, and *Lieutenant (jg) H. D. Campbell*, USNR.

## Opinion of the Court

KILDAY, Judge:

At their trial in common by general court-martial, both accused were convicted of larceny of two KD2R-5 drone engines, property of the United States Government, willful destruction of parts of these engines, and conspiracy to commit this larceny. They were each sentenced to a bad-conduct discharge, total forfeitures, confinement at hard labor for two years and reduction to the pay grade of E-1. The convening authority reduced the confinement to eighteen months but otherwise approved the findings and sentence. A Navy board of review affirmed without change. We granted review on three assignments of error all relating to the conspiracy conviction. However, because of our disposition of this case we need only consider whether the evidence as to the charge of conspiracy was sufficient to corroborate that portion of each accused's confession relative thereto.

The prosecution established its case by the testimony of four witnesses and the pretrial statements of each accused. The offenses occurred aboard the U.S.S. HANCOCK. Nine completely equipped drones were brought aboard by Lieutenant Lunn on February 17, 1962. Four were subsequently expended and the remaining five stored in Hangar

Bay Number One. On February 24, 1962, he discovered that two were missing. An immediate search of the ship ended in failure. On January 4, 1963, Commander Sailors found a large box containing aviation equipment in a stowage space aboard the HANCOCK. This equipment was identified by Lieutenant Lunn as the missing drones.

The third witness, Benton, a sailor assigned to the HANCOCK, identified this equipment as material which he and the two accused had hidden in the stowage cache. He testified that in July or August 1962, he assisted Beverly and Gartley in removing the engines from a hiding place in a void, near Station Nine. In payment for his assistance he was offered one of the engines. While moving the equipment Benton learned from the others that they, along with one Taylor, had stolen the drones from Hangar Bay Number One, had dismantled them in a stateroom, and had secreted them near Station Nine. Because the ship was putting into port in the United States, it was feared that the engines might be found if work was required in that area and a new hiding place was needed.

The final Government witness established the voluntariness of the confessions which were admitted into evidence.

In their confessions, each of the accused detailed the initial planning between themselves and Taylor to steal the engines, the manner in which the larceny was committed, and the concealment of the drones in various parts of the ship. According to both statements, the witness Benton was not a party to the original theft and was not made aware thereof until some months later when it became necessary to move the equipment.

As can be seen from the above, the totality of the Government's evidence on the charge of conspiracy is contained in the pretrial statements of each accused and the testimony of the witness Benton. But Benton was not a member of the conspiracy and only learned of the concerted theft from Beverly and Gartley some months thereafter. On

this particular point he testified as follows:

"Q. Will you tell the court, please, to the best of your knowledge, the substance of what Beverly and Gartley told you?

"A. They explained to me during the movement of these engines, the theft and the reason that they needed to be moved, that they were pulling into Hunters Point on arrival in the United States, and that the engines might be found in this void, that there might be work required in that void and they needed to be moved from this void to some other place.

"Q. Did they tell you who had originally taken the drones?

"A. Yes, they did.

"Q. Who did they tell you took them?

"A. A man by the name of Taylor, whom I didn't know and a man by the name of Beverly and Gartley."

Nowhere in his testimony does he state that he was told of any advance agreement by the parties to the theft to accomplish the same but only that they acted in concert. This need not deter us, however, since generally the rule for the admission of evidence against co-actors is substantially the same as that applied in cases involving co-conspirators. United States v Long, 2 USCMA 60, 6 CMR 60; United States v Miasel, 8 USCMA 374, 24 CMR 184. And, as we stated in *Miasel*, at page 378:

"The law is well settled that the acts and declarations of a conspirator or co-actor, pursuant to, and in furtherance of, an unlawful combination or crime, are admissible against all co-conspirators or co-actors during the existence of the conspiracy. Delli Paoli v United States, 352 US 232, 77 S Ct 294, 1 L ed 2d 278; Clune v United States, 159 US 590, 16 S Ct 125, 40 L ed 269; Logan v United States, 144 US 263, 12 S Ct 617, 36 L ed 429."

See also United States v Salisbury, 14 USCMA 171, 33 CMR 383,

However, as we pointed out in *Maisel* and reaffirmed in *Salisbury*, both supra:

" '. . . once a joint enterprise has ended, either as a result of accomplishment of the objective, abandonment, or withdrawal of any of the members of the group, subsequent acts and declarations can affect only the actor or declarant.' Fiswick v United States, 329 US 211, 67 S Ct 224, 91 L ed 196; Krulewitch v United States, 336 US 440, 69 S Ct 716, 93 L ed 790; Delli Paoli v United States, supra; Logan v United States, supra.' [Emphasis supplied.]" [United States v Salisbury, supra, at page 174.]

The question before us then is whether the testimony of Benton referred to acts and declarations of the parties during or after completion of the conspiracy. That is, when did the conspiracy, in this case, end?

We were faced with a similar question in United States v Salisbury, supra. There, as here, the central ▌ object of the conspiracy was the larceny of Government property; and we held in *Salisbury* that the conspiracy was completed when the object of the conspiracy was obtained. So, here, we find that the conspiracy in this case ended with the theft of the engines in February 1962. "The overt acts averred and proved may thus mark the duration, as well as the scope, of the conspiracy." Fiswick v United States, 329 US 211, 91 L ed 196, 67 S Ct 224 (1946). It is clear that Benton learned of the theft after the conspiracy had ended. His testimony, therefore, as to the declarations of Beverly and Gartley that they, in concert with Taylor, had stolen the engines, was admissible only against the one who made the statement and not binding on the other parties to the conspiracy. As stated by the Supreme Court in Lutwak v United States, 344 US 604, 97 L ed 593, 603, 73 S Ct 481 (1953):

". . . There can be no furtherance of a conspiracy that has ended. Therefore, the declarations of a conspirator do not bind the co-conspirator if made after the conspiracy has ended. That is the teaching of Krulewitch v United States, 336 US 440, 93 L ed 790, 69 S Ct 716, and Fiswick v United States, 329 US 211, 91 L ed 196, 67 S Ct 224, both supra."

Acts, however, which are not intended to be a means of expression and which are relevant to prove the ▌ existence of a conspiracy may be received in evidence without regard to whether the combination was ended prior to their commission. United States v Salisbury and Lutwak v United States, both supra. In *Salisbury* we found that the post-conspiratorial preparation of a form for the transfer of the stolen property and the sudden "discovery" of the proper sum of money, two days after the larceny, to cover the purported sale, tended to establish the existence of the conspiratorial arrangement. And in *Lutwak,* a conspiracy to defraud the United States by obtaining the illegal entry of alien war brides, the Supreme Court similarly held with regard to the subsequent uncontested divorce actions and separation of the purported couples, all of which took place after the date on which the Court deemed the conspiracy to have ended. It is to that portion of Benton's testi- ▌ mony, then, which referred to the activities of both accused in moving the engines from one hiding place to another, that we address ourselves. Does this action, in and of itself, tend to establish the existence of a conspiratorial arrangement to commit larceny? We think that it does not.

Unlike the situation in *Salisbury* where the post-conspiratorial acts were intended to make the larceny look like a sale, and in *Lutwak* where the separation of the spouses and the uncontested divorces were a part of the original agreements, we have here an act akin to that which the Supreme Court in Grunewald v United States, 353 US 391, 405, 1 L ed 2d 931, 943, 77 S Ct 963 (1957), described as an "act of concealment done after . . . [the] central objectives have been attained, for the purpose only of covering up after the crime." In *Grunewald,* the Government averred and proved an actual agreement to conceal the existence of the "fix and

471

the fixer" in an internal revenue matter, with the main objective of the conspiracy the obtaining of "no prosecution" rulings in two tax cases. In arguing that the conspiracy extended beyond the date of the tax rulings, the Government, in its proof, relied upon subsequent activities of the conspirators to conceal the irregularities in the disposition of these cases and on hearsay declarations of the co-conspirators.

Rejecting the Government's argument that this situation is like unto kidnapers in hiding awaiting the payment of ransom, the Court said:

". . . More closely analogous to our case would be conspiring kidnapers who cover their traces after the main conspiracy is finally ended —i.e., after they have abandoned the kidnaped person and then take care to escape detection. In the latter case, as here, the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." [Grunewald v United States, supra, at pages 405, 406.]

"By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." [Grunewald v United States, supra, at page 405.]

Cf. United States v Salisbury and Lutwak v United States, both supra.

In the case at bar, there is no evidence that the action of Beverly and Gartley in moving the stolen engines from one hiding place to another indicates anything more than that they did not wish to be apprehended. As such they are inadmissible to prove a conspiratorial arrangement.

With reference to the pretrial state-

ments of Beverly and Gartley in which each detailed his prelarceny planning with the other, and the aforementioned Taylor, we find this question amply decided in Krulewitch v United States, supra. There, as here, there is no showing that either statement was made in the other's presence or that one accused authorized the other to make such a statement. These hearsay declarations of co-conspirators, not made pursuant to or in furtherance of the objectives of the conspiracy, are admissible only against the one who made the statement and not against any or all of his co-conspirators. "This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal courts." (Krulewitch v United States, supra, 336 US at 443.) We do not intend to depart from this rule.

In sum, then, we find in this record no evidence, other than the confession of each accused and his statement to Benton, that the offense of conspiracy had probably been committed by someone. Since an accused cannot legally be convicted upon his uncorroborated confession or admission and since other confessions or admissions of the accused are not such corroborative evidence (United States v Smith, 13 USCMA 105, 32 CMR 105; Manual for Courts-Martial, United States, 1951, paragraph 140*a*), we necessarily hold that the evidence as to Charge I was legally insufficient. Holding as we do we need not reach the additionally granted issues pertaining to the law officer's instructions on conspiracy.

In order to dispel any doubt that might arise, we hasten to point out that our holding does not in any way disturb Benton's testimony that each accused admitted to him a personal participation in the theft. As the other evidence of record provided the requisite corroboration, this testimony was competent and admissible on the charges of larceny and destruction of Government

property, as were the other pretrial statements by the accused in which each admitted his part therein.

We cannot leave this matter without expressing our concern over the fact that we have noticed an increasing trend in the military to charge, in addition to the substantive offense, the crime of conspiracy where two or more accused are believed to have committed an offense in concert. Oftentimes the proof of conspiracy is meager and on occasion, as here, is legally insufficient. While we recognize that to unite back of a criminal purpose, the strength, opportunities and resources of many is obviously more dangerous and more difficult to police than the efforts of a lone wrongdoer, the offense charged may be no more than the concerted planning and action of two thieves bent on personal gain, as in the case at bar. This is hardly the historical concept of conspiracy as envisioned in matters political, syndicated crime, obstruction of justice, restraint of trade or other similar large-scale nefarious combinations.

Mr. Justice Jackson, in a separate concurring opinion in Krulewitch v United States, supra, at page 445, in which he was joined by Justices Frankfurter and Murphy, calls attention to "a present drift in the federal law of conspiracy. . . . The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice."

In a well-reasoned and well-documented opinion, he severely criticizes attempts to imply, presume or construct a conspiracy, except as one may be found from the evidence, and he concludes by stating that "I think there should be no straining to uphold any conspiracy conviction where prosecution for the substantive offense is adequate and the purpose served by adding the conspiracy charge seems chiefly to get precedural advantages to ease the way to conviction."

Justice Jackson's separate concur-rence in *Krulewitch* was cited with approval in *Grunewald* and we can only add our voice thereto. We believe the military would be well-advised to heed the comments of this eminent jurist and especially his closing sentences: "Few instruments of injustice can equal that of implied or presumed or constructive crimes. The most odious of all oppressions are those which mask as justice."

The decision of the board of review as to Charge I is reversed and the charge is dismissed. The decision as to Charges II and III is affirmed. The record of trial is returned to The Judge Advocate General of the Navy. The sentence may be reassessed by the board of review or a rehearing on sentence may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

In my opinion, the evidence *aliunde* the confessions indicates with reasonable probability that at least two persons contrived the theft of the airplane drone engines. The engines were stored for the night in Hangar Bay Number One. A security guard was posted in that area. A "spot check" of the equipment was made by the officer in charge at 10:00 p.m. on February 23. At 7:35 the next morning, two drone engines with propellers were missing; one of the engines had been unbolted from a drone. A search of the ship failed to uncover the stolen material. Photographs of parts of the engines ultimately recovered indicate that, with the propellers attached, the engines were bulky and not easy to carry. It is reasonably inferable, therefore, that one person could not carry away both engines in a single trip. Of course, it is possible that a single person made two or more trips to the hangar, but, considering the presence of the security guard, it is more probable that the theft was accomplished in one maneuver by two or more persons.

The necessity for a lookout to warn against the approach of the security guard, and the essentiality of so concealing the engines that they would not be uncovered in the search which could be expected upon discovery of the theft

the next morning, indicate the probability of preliminary planning by two or more persons for successful accomplishment of the theft. Probability, not proof beyond a reasonable doubt, of agreement to commit the theft is all that is needed to justify the admission into evidence of the accused's confessions. United States v Smith, 13 USCMA 105, 32 CMR 105. I conclude there is sufficient independent evidence of the conspiracy to corroborate the accused's confessions, and to support the findings of guilty of Charge I and its specification.

I have examined the assignments of error concerning the instructions. In light of the accused's confessions, there is no fair risk of prejudice that could result from any error or inexactitude in the instructions. I would, therefore, affirm the decision of the board of review.