**UNITED STATES of America, Appellee,**

v.

**Leonardo BRUNO, Defendant–Appellant.**

**No. 358, Docket 88–1184.**

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1988.

Decided April 17, 1989.

---

Avraham C. Moskowitz, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., Linda Imes, Asst. U.S. Atty., of counsel), for appellee.

Joan Palermo, New York City (Louis R. Aidala, New York City, of counsel), for defendant-appellant.

Before LUMBARD, MESKILL and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

Leonardo Bruno appeals from his conviction on narcotics charges entered in the Southern District of New York, Cedarbaum, *J.*, on May 6, 1988, following a jury trial. Bruno seeks reversal and a new trial on five grounds. First, he contends that the court erroneously charged the jury that Bruno could be convicted on counts of using firearms in relation to drug trafficking, assaulting a federal official with a deadly weapon and attempting to murder a federal agent, as a conspirator who is liable for the foreseeable acts committed by his co-conspirators in furtherance of the conspiracy. Second, Bruno argues that the court, after having granted four additional peremptory challenges to the defendants, should not have granted the government one additional challenge without the defense's consent. Third, Bruno claims that he was unfairly prejudiced by the prosecution's failure to obey the court's ruling limiting the scope of its cross-examination concerning a prior arrest. Fourth, Bruno contends that the judge failed to rule on his motion for judgment of acquittal at the close of the government's case pursuant to Fed.R.Crim. P. 29(a). Finally, Bruno argues that the court failed to make explicit findings that there was sufficient evidence from which the jury could find that he was a member of the conspiracy prior to admitting evidence of hearsay statements and acts committed by alleged co-conspirators. We affirm.

Bruno and his co-defendants, Jose Rodriguez, Ramon Molina and Pedro Irizagri, were indicted and tried on six counts. Count One charged the defendants with conspiring to possess, with intent to distribute, approximately six kilograms of cocaine, 21 U.S.C. § 846. Count Two charged them with possessing, with intent to distribute, multi-kilogram quantities of cocaine, 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2. Count Three charged them with use of firearms during drug trafficking, 18 U.S.C. §§ 924(c) and 2. Count Four was dismissed at the end of the government's case. Count Five charged the defendants with assaulting an agent of the Drug Enforcement Administration (DEA) with a deadly weapon, 18 U.S.C. §§ 111 and 2. Count Six charged them with attempted murder of a DEA agent, 18 U.S.C. §§ 111, 1114 and 2.

The jury convicted Bruno and Irizagri on Counts One, Two, Three and Five, but acquitted them on Count Six. Rodriguez was convicted on Counts One and Two, but was acquitted on Counts Three, Five, and Six. Molina was acquitted on all counts.

*The People's Case*

The government's evidence at trial consisted principally of the testimony of undercover and surveillance agents. Sergeant Lawrence Jonigan, an undercover agent employed by the New York State Police, testified that on July 6, 1987, he met a confidential informant in the Bronx who introduced him to defendant Rodriguez. The three met in Sergeant Jonigan's car, and the informant served as interpreter. Surveillance officers, including Detective Perretto, Detective Walsh, Special Agent Moran, and Detective Puello were nearby. In response to Jonigan's request for six kilograms of cocaine, Rodriguez quoted him a price of $23,000 per kilogram. After some negotiation, they agreed on $22,000 per kilogram to be delivered on the following day, July 7th, at the same location. Each would bring along a partner and Jonigan would have $132,000 in cash.

The next evening, Sergeant Jonigan, accompanied by Special Agent James Greenan of the DEA, met with Rodriguez and the informant in the Bronx. Jonigan showed Rodriguez a bag in his car trunk which he said contained $132,000. Agreeing not to count the money at that time, Rodriguez told Jonigan that he would conclude the deal in an hour at another location in the Bronx.

Later that night, at the agreed place, Rodriguez, accompanied by his brother, Juan Bautista, a/k/a "Jose Manuel Rodriguez," and by Ramon Molina, introduced Jonigan to Bautista, whom he called "his man." Bautista produced two cocaine samples and handed them to Jonigan.

Bautista informed Jonigan that, because his supplier did not want to meet Jonigan, only the informant would be permitted to pay the money and buy the drugs. Jonigan stated he would not do business under those terms and that he wanted to see the six kilograms himself before paying. After further negotiation, Bautista told Jonigan that the deal could not be consummated on Jonigan's terms until the following evening.

The next day, July 8th, the informant took Jonigan and Greenan to the Bronx to meet Bautista and Molina. Bautista said the transaction would be completed shortly and arranged a meeting at 188th Street and Webster Avenue in the Bronx at 9:00 p.m.

At the appointed time, the informant approached Jonigan and Greenan in their car on Webster Avenue and told them that Bautista had entered a building on the other side of the avenue and that Molina and Rodriguez were sitting in their car on 188th Street. A few minutes later, Bautista approached and told Jonigan that, before delivering the money, he would be allowed to see the cocaine in the apartment, where he would find only two other people, both unarmed.

Jonigan followed Bautista and the informant into the courtyard of an apartment complex at 373–375 E. 188th St., where they met Jose Morales. Morales stated that Jonigan would not be permitted to enter the building. When Jonigan threatened to call off the deal, Morales went into number 375 for a short time. Detective Puello saw Morales speak to one of the occupants of the building and rack a round of ammunition into an automatic pistol prior to returning to the courtyard where he instructed Jonigan, Bautista and the informant to follow him into number 373, to apartment 5B.

As Jonigan entered the apartment, Pedro Irizagri, standing in the kitchen doorway, pointed what appeared to be a machine gun at him. Bruno and two other men were standing in the living room with their right hands behind their backs. Morales then drew a silver-plated .32 automatic from his waistband and pointed it at Jonigan. Jonigan raised his hands, pulled down his pants and removed his shirt to show that he was unarmed.

Morales instructed Jonigan to sit down in the living room. When Jonigan asked to see the cocaine, Morales motioned with his gun for Bruno to go into the bedroom. Bruno returned with two sealed rectangular packages containing white powder and handed them to Jonigan. After examining them, Jonigan said that he did not think that six packages would amount to six kilograms. Morales then ordered Jonigan into the bedroom at gunpoint.

In the bedroom, Jonigan observed Bruno and another man kneeling by a long mirror, which was lying on the floor and covered with white powder. Behind them were a triple beam scale, four clear plastic bags that appeared to contain one kilogram of cocaine each and a shopping bag containing several kilogram size packages.

At Morales's instructions, Bruno handed Jonigan a kilogram package of cocaine. After weighing and inspecting it, Jonigan told Morales, who was pointing his gun at him all the while, that he was satisfied and was ready to get the $132,000 from Greenan in his car. When Morales advised him that he could not leave, Jonigan said Greenan would not release the money unless Jonigan himself was present. After consulting with various others in the apartment, Morales said that Jonigan could go, but the informant must remain. Jonigan

refused. After further discussion with his partners, Morales finally agreed to allow Jonigan and the informant to leave, provided that Morales escort them and Bautista remain.

Bruno was still in the bedroom when the three men left. As he approached Greenan's car, Jonigan signalled the surveillance team that he had seen the cocaine. Greenan drove his car around the block and placed his service revolver in the bag which contained only $74,000. He then stopped in front of number 373, removed the bag from the trunk and followed Jonigan, Morales and the informant into the building.

As Morales pressed the entry buzzer, he suddenly swung around and lunged at Greenan. With his left hand he reached for the bag and with his right he pulled a .32 automatic pistol from his waistband. Greenan yelled "Police," and drew his gun from the bag. Morales fired and wounded Greenan, who returned the fire, hitting Morales and causing him to fall back against the wall of the vestibule. As he slid down the wall, Morales fired two more shots. When Greenan emptied his revolver and clicked off a dry round, Jonigan grabbed Morales's gun. Greenan and the informant lay wounded on the floor and Morales later died from his wounds.

As Jonigan climbed the stairs, he spotted Bautista just above the third floor landing. He yelled "Police, freeze," but Bautista spun around toward him, flashing what appeared to be a blue-finished handgun. Jonigan immediately fired one shot, killing Bautista, whose revolver fell over the railing and was never recovered.

Jonigan mounted the steps to the fifth floor, where he saw Bruno standing in the doorway of apartment 5B, holding a silver-finished handgun. Jonigan yelled "Police, freeze," but Bruno retreated into apartment 5B while raising his gun towards Jonigan. Jonigan at once fired three shells which hit the door frame as Bruno closed the door.

The surveillance team tried unsuccessfully to help Jonigan gain entry to the barricaded apartment. Jonigan remained by the door while Walsh, Moran and Baum climbed the stairs towards the roof and apprehended Irizagri in the stairwell. A loaded semi-automatic pistol was found on the floor beside him.

Forty-five minutes later, officers of the New York City Police Department broke down the door of apartment 5B and apprehended Bruno. In searching the apartment, Walsh found cocaine residue on plastic bags and trays, other narcotics paraphernalia and a silver .32 caliber revolver.

*The Defense Case*

Defendants Bruno, Rodriguez and Molina each took the stand and denied any involvement in the sale of cocaine. Irizagri remained silent.

Bruno testified that, for about two and one half years, he had lived in the basement of number 373, where he assisted the superintendent in exchange for lodging. Prior to July 8, 1987, he had occasionally performed odd jobs for the tenant of apartment 5B, whom he knew as Mr. Albannes, and who sometimes paid him with cocaine.

On the evening of July 8th, Bruno was summoned to apartment 5B to fix a faulty toilet tank and to remove garbage. In the apartment he observed five or six unknown men, two of whom he identified in court as Irizagri and Jonigan. Bruno denied having been in the bedroom that night or having had any contact whatsoever with Jonigan.

Before Bruno had finished removing the garbage from the apartment, he stopped at his girlfriend's apartment in number 375 for dinner. When he later returned to apartment 5B to complete his errand, he noticed that everyone had left. Some time after this, Bruno, hearing gunshots, looked out of the window and saw groups of people running on the street and a helicopter hovering overhead. Still later, Bruno heard banging on the apartment door and was told it was the police. He tried to open it, but the police broke in before he could do so.

Rodriguez and Molina testified that the first time they saw Jonigan was on July 7th, when they were in a taxi with Bautista, and a friend of Bautista. They were inside the taxi when Jonigan spoke briefly

to Bautista and his friend, who had gotten out of the car to telephone. Molina and Rodriguez did not participate in the conversation and did not know what it was about; they simply followed Bautista's instruction to wait for him in a nearby restaurant. They did not speak to Jonigan. No mention was made of any narcotics. About fifteen minutes later, Bautista returned and the parties went back to their homes.

On July 8th, at Bautista's request, Rodriguez and Molina accompanied him and his friend to 373 E. 188th Street where they followed Bautista's instructions to wait in the car until they returned. Rodriguez and Molina did not know the reason for Bautista's entering the building. After waiting for some time, they heard gunshots and, shortly thereafter, were arrested by the police.

The one-month trial concluded on March 9, 1988, when the jury convicted Rodriguez, Bruno and Irizagri and acquitted Molina. Judge Cedarbaum sentenced Bruno to concurrent terms of imprisonment of one year and one day on Counts One, Two and Five and to a consecutive term of imprisonment of five years on Count Three. On Count Two, Bruno was sentenced to a three year term of supervised release to begin after his incarceration. Bruno alone appeals.

*Bruno's Liability Under Pinkerton*

 Bruno's first claim on appeal is that the court erred in charging the jury that he could be convicted on Counts Three, Five and Six on the *Pinkerton* theory of conspirator liability because the substantive acts underlying those counts were not in furtherance of the conspiracy. Bruno argues that Morales's assault on Greenan and attempted murder could not be in furtherance of a conspiracy to sell narcotics because Morales's actions evince an intent to rob money for himself alone. We disagree. Bruno can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes. *Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct.

1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Wiley*, 846 F.2d 150, 154 (2d Cir.1988). Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury. *See Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); *United States v. Alvarez*, 755 F.2d 830, 848 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985).

There was ample evidence for the jury to conclude that the use of firearms by any one of the co-conspirators and Morales's assault on Greenan were in furtherance of the conspiracy and foreseeable by Bruno. The evidence showed that Bruno witnessed the use of firearms by his co-conspirators while they were negotiating with Jonigan and that he was himself armed when retreating from Jonigan into the apartment. The jury could conclude that Morales's assault on Greenan, whether prompted by a desire to steal the money or to avoid capture, was a foreseeable act in furtherance of the conspiracy. *See United States v. Alvarez*, 755 F.2d 830, 847–51 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985).

*Peremptory Challenges*

 Bruno's second claim is that the court's granting the government an additional peremptory challenge over the defendants' objections was a violation of Fed.R. Crim.P. 24(b) and warrants reversal. Prior to the voir dire of the jurors, Molina's counsel requested that defendants be granted additional peremptory challenges because they might have different views regarding prospective jurors. The four defendants were then sharing ten challenges and the government had six. Judge Cedarbaum agreed to give the defendants one additional challenge each and, over the objection of defense counsel, also granted the government one additional challenge. The defendants and the government utilized all their challenges, including the additional ones granted by the court.

We conclude that, although the court erred in granting the extra peremptory challenge to the government over the de-

fendants' objection, the error was harmless.

Rule 24(b) provides in relevant part as follows:

(b) Peremptory Challenges.... If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges.... If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.

Although this Rule accords the court discretion in awarding additional challenges to defendants in multi-defendant cases, it does not provide authority to grant any additional challenges to the government unless the defense consents. *See United States v. Haldeman,* 559 F.2d 31, 79–80 (D.C.Cir. 1976) *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) and *United States v. Gleason,* 616 F.2d 2, 29 (2d Cir. 1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980).

■ Nevertheless, the granting of an additional challenge to the government does not require reversal of a conviction where the defendant fails to show any prejudice. *U.S. v. Gleason,* 616 F.2d at 29. Bruno has not alleged or proved any prejudice. There is no evidence that the jury was biased or unrepresentative. Although the judge could have refused to grant the defendants any additional challenges, she did so, and by allowing the defendants four challenges to one for the government, the resulting proportion was more favorable to the defendants than the prior ratio had been. Had the judge conditioned the grant of additional challenges upon the defendants' consenting to one challenge for the government, it seems altogether likely that the defendants would have consented.

*Cross–Examination on Bruno's Prior Possession With Intent to Sell*

■ Bruno next contends that the prosecution disobeyed a ruling by the court limiting the scope of the government's cross-examination about his prior possession of narcotics. We disagree.

Prior to testifying, Bruno's counsel asked Judge Cedarbaum to prohibit the government from cross-examining Bruno about previous possession of narcotics with intent to distribute. Over counsel's objection, the court permitted the government to ask the question, but only to impeach Bruno's claim that he was "merely present" during the drug transaction. The court added that the government would be bound by whatever answer Bruno gave.

The exchange between Bruno and the Assistant United States Attorney on cross-examination was as follows:

Q. By the way, have you ever possessed crack with intent to distribute?

A. I have been in possession of crack, not with intent to distribute it.

Q. How much was the greatest amount you ever had in your own possession?

A. Approximately 10 vials.

Q. And they were all for your own use?

A. No, sir.

Q. So then you were going to give them to somebody else?

A. They gave me the money so that we could buy it among three, if I can remember.

Mr. Aidala: I reserve my rights.

Q. Who gave you the money?

A. Friends of mine.

Q. Can you tell me their names?

A. One was called Jose and Valentine.

Q. Do you know their last names?

A. No, sir.

The Court: All right. Let's move on.

Mr. Aidala: I reserve my rights, judge.

Q. And you were going to pick up the crack for the three of you and share it with them?

The Court: Let's move on.

We find that the prosecution did not disobey the court's ruling in eliciting from the defendant on cross-examination evidence of prior drug possession. The government was entitled to prove Bruno's intent pursu-

ant to Fed.R.Evid. 404(b) because he had placed his intent in issue by claiming that he was "merely present" during the drug transaction. *United States v. Tussa*, 816 F.2d 58, 68 (2d Cir.1987). The court's ruling was simply intended to prevent the government from using extrinsic evidence concerning a prior conviction of Bruno. Because Bruno's initial answer to the government's question was equivocal, the prosecution was entitled to clarify his response with further inquiry. The prosecution's questions did not refer to any evidence which the court meant to exclude.

*The Rule 29(a) Motion*

■ Bruno's fourth contention is that Judge Cedarbaum committed reversible error by failing to rule on his motion at the end of the government's case for judgment of acquittal for lack of sufficient evidence pursuant to Fed.R.Crim.P. 29(a). We disagree.

Bruno made the motion on February 24th; the court reserved decision. Bruno did not testify until March 1st. When reminded of the pending motions at the end of Bruno's testimony, the court continued to reserve judgment. The next day, March 2nd, before charging the jury, the judge said that she had decided to submit all the remaining counts to the jury, thereby implicitly denying the motion.

The court should have ruled on Bruno's motion at the close of the government's case. Rule 29(a) requires a prompt decision so that a defendant does not bear the risk of presenting evidence that might cure an otherwise fatal defect in the government's case. *United States v. Neary*, 733 F.2d 210, 218–19 (2d Cir.1984).

■ Nevertheless, the delay in Judge Cedarbaum's ruling was harmless in this case; the evidence presented by the government was clearly sufficient to support a conviction. According to the testimony of Jonigan and Walsh, Bruno was armed, he played a role in selling the cocaine to Jonigan in the apartment, he tried to prevent the agents from gaining entry to the apartment. Thus, there is no reason to believe that the court would have granted

the motion; the defendant was not prejudiced by the delay.

*The Geaney Findings*

Finally, Bruno argues that the court failed to make specific findings that his participation in the alleged conspiracy had been established by a preponderance of the evidence prior to admitting hearsay declarations of the other co-conspirators. We disagree.

■ Although co-conspirator declarations are inadmissible against a defendant unless there is sufficient evidence to establish that the defendant was a member of the conspiracy in furtherance of which the challenged statements were made, *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987) and *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), Bruno never objected to any co-conspirator statements and never requested that *Geaney* findings be made. We need not consider his claim on appeal.

■ In any event, there was abundant evidence that Bruno was a participant in a conspiracy to sell cocaine. The statements and the acts of his co-conspirators were evidence to be considered by the jury in reaching their verdict. The court's finding that the defendant participated in the conspiracy need not be made explicitly on the record. "[A]n implicit *Geaney* ruling can be inferred in the trial judge's decision to receive the evidence and to deny a directed verdict of acquittal on the conspiracy charge." *United States v. Perez*, 702 F.2d 33, 36 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983).

Judge Cedarbaum implicitly made findings to support the admissibility of co-conspirator statements by admitting the statements into evidence and submitting the conspiracy count to the jury. We find that a *Geaney* ruling may properly be inferred because the court had already heard overwhelming evidence to show that a conspiracy existed and that Bruno was a participant.

Bruno's other claims do not merit discussion.

Affirmed.