KEARSE, Circuit Judge,
dissenting:
I respectfully dissent from the majority’s decision to reverse the convictions of Messrs. Grimm, Carollo, and Goldberg (“defendants”) on statute-of-limitations grounds. In my view, a major flaw in the majority’s opinion is its failure to acknowledge the implications of the facts that the superseding, indictment (“Indictment”) alleged, and that the jury was instructed that in order to convict it must find, that the corporate organizations that won the described guaranteed investment contracts (“GICs”) by engaging in the bid-rigging conspiracies — which enabled them to, inter alia, pay interest to municipalities at artifi-dally depressed rates for the duration of the GICs — were themselves coconspira-tors, albeit unindicted coconspirators.
At various stages of the bid rigging, all three defendants were employed by General Electric or related companies, which were referred to in the Indictment as “Provider B.” The Indictment alleged that Provider B sold investment agreements and other municipal finance contracts through its business leaders and marketers, including Grimm, Carollo, and Goldberg. (See Indictment ¶2.) Grimm and Goldberg had authority to and did submit bids for investments and other mu: nicipal finance contracts on behalf of Provider B; Carollo was a manager and supervisor with respect to that aspect of Provider B’s business. (See id. ¶¶ 3-5.) During the bid-rigging period, Goldberg left Provider B and joined Financial Security Assurance, part of a group of related financial services companies that was referred to in the Indictment as “Provider A.” (See Indictment ¶¶ 50, 51.) As a vice president or director of Provider A, Goldberg “had authority to and did submit bids for investment agreements] or other municipal finance contracts for Provider A.” (Id. ¶ 51.)
In light of the Indictment’s allegations that Grimm, Carollo, and Goldberg, in engaging in bid rigging, acted on behalf of providers who were coconspirators, several well established principles of conspiracy liability compel me to conclude that the *505 statute of limitations did not bar the prosecution of these defendants.
[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.
Grunewald v. United States, 358 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (emphases added). In order “[t]o constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission on the part of [a defendant] or her coconspirators,” United States v. Ben Zvi 242 F.3d 89, 97 (2d Cir.2001) (“Ben Zvi”); see, e.g., United States v. Salmonese, 352 F.3d 608, 617-18 (2d Cir.2003) (“Salmonese ”). However, “[t]he overt act, without proof of which a charge of conspiracy [under 18 U.S.C. § 371] cannot- 'be submitted to the jury, ... need not be itself a crime.” Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942).
Foreseeable acts of one coconspirator in furtherance of the conspiracy are attributable to all coconspirators. See, e.g., Pinkerton v. United States, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Milstein, 401 F.3d 53, 72 (2d Cir.2005). This principle is applicable even if the coconspirator who so acts is unindicted. See, e.g., United States v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir.1980) (acts of unindicted coconspirators may prove continued existence of the conspiracy); see also United States v. Matthews, 168 F.3d 1234, 1246 (11th Cir.) (un-indicted coconspirator’s overt acts within a district in furtherance of a conspiracy suffice to establish venue in the district), cert. denied, 528 U.S. 883, 120 S.Ct. 199, 145 L.Ed.2d 167 (1999); United States v. Sandy, 605 F.2d 210, 215-16 (6th Cir.) (overt acts alleged and proven to have been performed by an'unindicted cocon-spirator sufficed to connect the defendants to the conspiracy), cert. denied, 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979).
' Conspiracy is “a continuing crime[ ] that is not complete until the purposes of the conspiracy have been accomplished or abandoned.” United States v. Pizzonia, 577 F.3d 455, 466 (2d Cir.2009) (internal quotation marks omitted), cert. denied, 558 U.S. 1115, 130 S.Ct. 1088, 175 L.Ed.2d 889 (2010); see generally United States v. Kissel, 218 U.S. 601, 610, 31 S.Ct. 124, 54 L.Ed. 1168 (1910) (“a conspiracy may have continuance in time”). “Once a conspiracy is shown to exist, which in its nature is not ended merely by lapse of time, it continues to exist until consummated, abandoned or otherwise terminated by some affirmative act.” United States v. Rucker, 586 F.2d 899, 906 (2d Cir.1978) (‘‘Rucker”).
■ Applying this principle, “[t]his court has consistently ruled that where a conspiracy’s purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators’ receipt of ‘their anticipated economic benefits.’ ” Salmonese, 352 F.3d at 615 (quoting United States v. Mennuti 679 F.2d 1032, 1035 (2d Cir.1982), and citing United States v. LaSpina, 299 F.3d 165, 175 (2d Cir.2002); Ben Zvi 242 F.3d at 98; United States v. Fletcher, 928 F.2d 495, 500 (2d Cir.), cert. denied, 502 U.S. 815, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991); United States v. Knuckles, 581 F.2d 305, 313 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978)); see also United States v. Azeem, 946 F.2d 13, 16 (2d Cir.1991) (“A conspiracy continues after the occurrence of the underlying offense and is not completed until the conspirators receive their payoffs.”); United States v. Fitzpatrick, 892 F.2d 162, 167 (1st Cir.1989) (“a conspiracy continues until the *506 anticipated economic benefits of the defendant are realized”). “[A]bsent withdrawal, a conspirator’s ‘participation in a conspiracy is presumed to continue until the last overt act [in furtherance of the conspiracy] by any of the conspirators.’ ” Salmonese, 352 F.3d at 615 (quoting United States v. Diaz, 176 F.3d 52, 98 (2d Cir.), cert. denied, 528 U.S. 875, 120 S.Ct. 181, 314, 315, 145 L.Ed.2d 153 (1999)). And “[e]very act in furtherance of the conspiracy is regarded in law as a renewal or continuance of the unlawful agreement.” Rucker, 586 F.2d at 906.
In the present case, the allegations in the five counts of the Indictment on which defendants were convicted clearly delineate the scope of the conspiratorial agreements with respect to goals, memberships, and durations. As to the conspiratorial objectives, the Indictment alleged that one of the goals of each of the conspiracies charged in Counts I, II] and IV was “to defraud municipal issuers and to obtain money and property from municipal issuers by means of false and fraudulent pretenses” (Indictment ¶¶ 19, 27, 44), “increasing .the ... ‘profitability o/investment agreements and other municipal finance contracts awarded to Provider B by municipal issuers ... through the control and manipulation of bidding for investment agreements and other municipal finance contracts” .(id ¶¶ 21(a), 29(a), 46(a) (emphases added)). Similarly, the Indictment alleged that a goal of the conspiracies charged in Counts V and VI was to increase the profitability of such contracts for Provider A. (See, e.g., id. ¶¶ 56(a), 63(a).)
As to membership in the conspiracies, Counts I and II of the Indictment alleged that all three defendants’ “co-conspirators[] includfed] Provider B” (Indictment Count I, ¶¶ 18, 19, 20, 22; id. Count II ¶¶ 26, 27, 28, 30); and Count IV alleged that Grimm’s “co-conspirators[ ] includ[ed] Provider B” (Indictment ¶¶ 43, 44, 45, 47). Counts V and VI likewise alleged that Goldberg’s “co-eonspirators[ ] included] Provider A.” (Indictment Count V, ¶¶ 53, 54, 55, 57; id. Count VI, ¶¶ 60, 61, 62, 64.)
As to duration, the Indictment alleged that length of the investment agreements of the type that were subjected to bid rigging here varies from “as short as one month to as long as thirty years.” (Indictment ¶ 10.) To the extent that the providers sought to enjoy the difference between a fairly arrived-at market rate of interest and the fraudulently arrived-at rate of interest to which the municipalities agreed as a result of the bid rigging, the providers would realize economic gains each time they made an interest payment to the municipal entity at the lower rate. See, e.g., United States v. Walker, 653 F.2d 1343, 1347 (9th Cir.1981) (finding injury to victim of rigged contract with each of the defendant’s payments at a “noncompetitive price”), cert. denied, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982).
With respect to overt acts in furtherance of the conspiracies, Counts I, II, and IV alleged, inter alia, that, Provider B made its payments on the GICs to the relevant municipal entities “at artificially determined [and/or] suppressed rates.” (Indictment Count 1, ¶ 22(f); id. Count II, ¶¶ 30(f), 30(g)(iii)); id. Count IV, ¶¶ 47(f), 47(g)(iii). Provider B was alleged to have continued to make such payments at least until approximately November 1, 2005 (Indictment Count I, ¶ 22(g)(iii)), June 30, 2006 (id. Count II, ¶ 30(g)(iii)), and November 1, 2006 (id. Count IV, ¶ 47(g)(iii)). Counts V and VI similarly alleged that Provider A made payments on the relevant contracts at interest rates that were artificially determined, and that those payments continued at least until October 2006 (Indictment Count V, ¶ 57(g)(iv)), and April 2006 (id. Count VI, ¶ 64(g)(iii)). All of *507 these dates were within the five-year limitations period that ended with the return of the original indictment in this case on July 27, 2010.
Whether the allegations in the Indictment were proven — including whether the unindicted corporate organizations, Providers A and B, were coconspirators — was of course a matter for the jury. “A corporation can act only through its agents, and the acts of individuals on the corporation’s behalf may be properly chargeable to it.” United States v. Paccione, 949 F.2d 1183, 1200 (2d Cir.1991) (internal quotation marks omitted), cert. denied, 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).
The jury here was instructed that “the government must prove that there was a mutual agreement among the defendant under consideration and at least one other person, together with the respective corporate provider and the broker that they represent, to cooperate with each other to accomplish the objectives of each charged conspiracy.” (Trial Transcript (“Tr.”) 3222 (emphases added); see also id. at 3223 (“Ultimately, you must ask yourself if the government has proved beyond a reasonable doubt the conspirators in the count you are considering, acting on behalf of the named corporate provider and broker, came to an understanding to violate the law and to accomplish the unlawful objectives of the alleged conspiracy.” (emphasis added)).)
In finding defendants guilty on the five counts under consideration, the jury necessarily found that Provider B conspired with the defendants charged in Counts I, II, and IV, and that Provider A conspired with the defendant charged in Counts V and VI. Defendants have not challenged the sufficiency of the evidence to support such findings, and I see no basis for such a challenge.
Whether an act by a coconspirator is in furtherance of the conspiracy is likewise a factual question to be determined by the jury. See, e.g., Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Bruno, 873 F.2d 555, 560 (2d Cir.), cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989). The jury here was instructed that “[a]n overt act was ‘in furtherance’ of a conspiracy if the act was undertaken in order to advance an objective of the conspiracy.” (Tr. 3235 (emphasis added).) It was also instructed that, in order to convict, it must find “that at least one object of each conspiracy existed at some point in time, within the period alleged in each of the counts.” * (Tr. 3224.)
• In my view, it was permissible for the jury to find that (a) an objective of the conspiracies was, as alleged, to enable the providers to make their periodic interest payments at artificially suppressed rates, and (b) that objective existed within the limitations period. It was also permissible for the jury to find that all of the providers’ interest payments were acts in furtherance of the conspiracies. Indeed, the payments were essential to the conspiracies’ success: If the payments were not made, the providers would be in breach of the investment contracts and would cease to achieve their conspiratorial goals of economic gain through payments of interest below fair market rates.
The majority’s conclusion that the statute of limitations bars this prosecution is flawed, in my view, not only because of its disregard of the roles of Providers A and B as coconspirators but also because of its misinterpretation of this Court’s prior rulings and its reliance on inappropriate factors. For example, the majority points out that many of the investment contracts at issue are to be performed “over a long time, typically up to 20 years or more.” *508 (Majority opinion ante at 503.) But “the duration of the conspiracy” is “determine[d]” by “the scope of the conspiratorial agreement,” Grunewald, 353 U.S. at 397, 77 S.Ct. 963; and here the precise goals of the conspiratorial agreements were to have long-term contracts awarded to Providers A and B, during which the providers would repeatedly make interest payments at artificially depressed rates, and thereby repeatedly reap the desired economic gains. The majority also states that the providers are making payments that are “noncriminal in themselves.” (Majority opinion ante at 503.) But an overt act “need not be itself a crime.” Braverman, 317 U.S. at 53, 63 S.Ct. 99. The majority further states that there was no evidence of “concerted activity” within the limitations period. (Majority opinion ante at 503.) But foreseeable overt acts by one coconspirator in furtherance of the conspiracy are attributable to all cocon-spirators. See, e.g., Pinkerton, 328 U.S. at 646-47, 66 S.Ct. 1180. “[A] conspiracy is a partnership in crime; and an ‘overt act of one partner may be the act of all without any new agreement specifically directed to that act.’ ” United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-54, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (quoting Kissel, 218 U.S. at 608, 31 S.Ct. 124).
The majority also, in my view, misinterprets the opinion of this Court in Salmo-nese as adopting the decision of the First Circuit in United States v. Doherty, 867 F.2d 47 (1st Cir.1989), which found a certain conspiracy count time-barred where the only acts within the limitations period were the defendant’s receipt of higher salary payments as a result of a promotion following his unlawful advance acquisition of test questions. The DoheHy court concluded that the statute of limitations barred the count in question because the defendant’s “receipt of salary is a ‘result’ of, not an act in furtherance of, the conspiracy,” 867 F.2d at 62, and that the indefinite duration of such salary payments raised the specter of “extending the conspiracy statute of limitations indefinitely beyond the period when the unique threats to society posed by a conspiracy are present,” id. The majority describes Salmonese as stating that the statute of limitations has run where
“there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place.” Salmonese, 352 F.3d at 616 (citing Doherty, 867 F.2d at 61).
(Majority opinion ante at 503.) I have several problems with this interpretation.
To begin with, Salmonese was in fact quoting DoheHy for purposes of discussion, rather than citing it as authority for the resolution of the Salmonese appeal. The next sentence in Salmonese began: “Were this court to follow DoheHy, [the defendant] would not benefit....” Salmonese, 352 F.3d at 616 (emphasis added).
Thus, Salmonese, unlike DoheHy, affirmed the defendant’s conviction and rejected his statute-of-limitations defense. The fact that Salmonese affirmed as to a conspiracy that came to a natural end after a limited period of time provides no authority for the proposition that the conspiracy in the present case must be deemed to have ended after a similarly limited period. Here, the coconspirators agreed to engage in bid rigging in order to secure for Providers A and B, respectively, lengthy contracts that would give the provider an economic gain each time it made an interest payment at the artificially depressed rate. The defendants thus entered into conspiracies that were not completed with the awards of the rigged contracts.
Further, although the majority quotes Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946), as supporting its view that “the advantageous *509 interest payment” in this case “is the result of a completed conspiracy, and is not in furtherance of one that is ongoing” (majority opinion ante at 503 (emphasis in original)), the majority miscasts the “result” of the bid-rigging conspiracy and ignores part of Fismck’s quoted language. The Fismck Court stated that what is necessary for a conspiracy to “become- a continuing one”' is “[cjontinuity of action to produce the unlawful result, or ... ‘continuous cooperation of the conspirators to keep it up.’” 329 U.S. at 216, 67 S.Ct. 224 (emphasis added). These are alternative ways in which a conspiracy may be continued; a conspiracy may be one that is “continuing” if there is simply a “[cjontinuity of action to produce the unlawful result,” id. And in this case I think it clear that continuity of action was present — and indeed was essential to the scheme. The “result” of the bid rigging is not, as the majority states, the providers’ “payments”; the result is the artificially arrived-at interest rate that gives the providers an economic gain each time a payment is made. Periodic payments must be made by the providers in order to realize the desired economic benefit from their advantageous interest-rate differential. Thus, continuity' of action after the awards of these rigged contracts was integral to the success of the conspiracies.
Finally, the majority’s view that in this case there is no evidence of any continued concerted activity posing the special societal dangers of society (see, e.g., majority opinion ante at 504 (“[t]he stream of GIC interest payments does not raise the underlying concern of concerted action”)) seems to me misguided. The policies underlying punishment of conspiracies include recognition that “[cjoncerted action ... increases the likelihood that the criminal object will be successfully attained,” and that “[g]roup association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.” Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961). Those policies should be of concern here. The bid rigging made it possible for the provider coconspirators to win contracts that would enable them to pay interest to the municipalities at substandard rates — something no single bidder could accomplish alone-and allowed the coconspirators'to succeed in a scheme sufficiently complex to allow various co-conspirators to enjoy their illegal gains at different times and for prolonged periods.
In sum, my view is that where a conspiracy is specifically designed to enable some of the coconspirators to win contracts that will provide them with economic gains repeatedly over the life of the contract by allowing them to make periodic interest payments at artificially low rates, the conspiracy ordinarily does not end — and each of the conspiracies at issue here did not end — before the contracting coconspirator’s last payment pursuant to the contract.
Accordingly, I dissent from the decision that the present prosecution was barred by the statute Of limitations.